# Richmond

JAMES W. REED V. ALBERT T. CHURCH.

April 8, 1940.

Record No. 2189.

Present, All the Justices.

The opinion states the case.

*Williams, Loyall & Taylor* and *W. R. L. Taylor,* for the plaintiff in error.

*Venable, Miller, Pilcher & Parsons*, for the defendant in error.

GREGORY, J., delivered the opinion of the court.

An action at law was instituted by Albert T. Church against Dr. James W. Reed for injuries alleged to have resulted to his eyes from improper medical treatment. A verdict and judgment for the plaintiff, Church, was obtained in the trial court.

On October 16, 1923, Mr. Church became unconscious and remained so for thirty days. Dr. Reed was called to treat him and undertook to diagnose the disease. Dr. Reed. is and has been for many years a reputable physician practicing in Norfolk and vicinity. His educational qualifications and experience as a physician have been good. He is what is commonly called a general practitioner.

Dr. Reed performed the usual tests on the plaintiff, including a blood Wassermann, which proved negative. He consulted with Dr. W. B. Newcomb, an outstanding diagnostician in Norfolk, and the latter secured spinal fluid from the plaintiff, which showed under tests that he was afflicted with cerebro-spinal syphilis, an incurable disease.

During the time the plaintiff was so critically ill it was necessary for Dr. Reed to drain fluid from his spine on thirteen different occasions in order to prevent convulsions. During this same period Dr. Reed administered two injections of neosalvarsan, a treatment for syphilis generally in use at that time.

Mr. Church regained consciousness after thirty days and thereafter was given several additional injections of neosalvarsan. According to Church, Dr. Reed told him that he had been cured after the last dose was given him. No further treatment was administered until 1937. During that interval of fourteen years Church enjoyed good health and good eyesight. In 1930 he was furnished reading glasses by an optical company and was able to read the intricate plans used in the service of a machinist in the navy yard.

At that time the examination disclosed no disease of the eyes.

On August 14, 1937, while awaiting a street car he fainted in the street. It was an extremely hot day. When he regained consciousness he was driven to the hospital and after preliminary treatment was sent to his home. Dr. Reed, who was called to attend him, found him in bed suffering with a violent headache and incoherence of speech. A blood Wassermann test was made and it was negative.

On August 30, 1937, Dr. Reed made what is termed an "official affidavit" for the Machinists Relief Association of Navy Yard, in which he certified that Church was sick and suffering from "Hyper Tension" (hypertension, or high blood pressure). This certificate was used to obtain the relief payments to which a sick member is entitled and it was introduced as an exhibit in the trial of the case.

Notwithstanding the statement made in the certificate that Church was suffering from hypertension, Dr. Reed concluded that he was in reality still suffering from cerebrospinal syphilis and decided to administer a series of injections of a preparation known as tryparsamide, an approved treatment for the disease. He administered an injection on August 20, 1937, and according to the testimony of the plaintiff eleven successive injections of tryparsamide were given him at intervals of four or five days. After the third injection the plaintiff stated that he made this complaint to Dr. Reed: "Doctor, my eyes are getting a little blurry. This treatment you are giving me is affecting my eyes," to which Dr. Reed replied, "When I get through it will clear up." According to his testimony, Church made several other complaints to Dr. Reed and each time he was assured by the doctor that his blindness would clear up.

Tryparsamide is a drug which has an arsenic base and has been developed by the Rockefeller Institute of Medical Research. It is manufactured by Merck & Company under a license and is sold in ampoules (small glass containers). Around each is a folder or pamphlet which describes the drug and its use. Two full pages of the pamphlet are de-

voted entirely to "Ocular Disturbance," and upon its appearance the directions are clear that there must be immediate cessation of the drug until recovery has taken place.

According to the testimony of the plaintiff, Dr. Reed continued the injections of tryparsamide after he had complained of his eyes. He was not directed to an oculist for an eye examination. The eye involvement continued and his vision diminished. Later the plaintiff called upon Dr. Eaton, an optometrist. He also called upon Dr. Buchanan, an optometric neurologist, and upon Dr. Diehl, an eye, ear, nose, and throat specialist. Those specialists informed him that he had permanent degeneration or atrophy of the optic nerve, which is a part of the brain. Dr. Diehl recommended to Dr. Reed a drug to be given the plaintiff by injections to counteract the effect of the tryparsamide and Dr. Reed administered the injections daily from October 5 to October 10, but without beneficial results. Dr. Diehl testified that Dr. Reed told him (Diehl) that he had given nine injections of tryparsamide to the plaintiff.

Later the plaintiff visited Johns Hopkins Hospital in Baltimore, Maryland, but his condition has not improved. He has what is commonly known as central, or "gun barrel," vision, and there are no prospects of his improving. His sight is so poor that he cannot perform his ordinary work and was unable to go to the doctor's office alone. He is almost blind.

Dr. Reed denied that he told the plaintiff in 1923 that he was cured. He also denied that he continued the treatment of tryparsamide after the plaintiff complained of his eyes. He maintained that he directed the plaintiff to Dr. Diehl, the eye specialist, after he had administered two injections of the drug. He also denied that he told Dr. Diehl that he had given the plaintiff nine injections. However, under elementary principles we must consider that these denials were rejected by the jury.

The evidence establishes that the plaintiff was suffering from cerebro-spinal syphilis in October, 1923, and that it is an incurable disease. The plaintiff testified that he did not

know with what disease he was afflicted but that he was assured that he had been cured. From the diagnosis made in 1923 and the "spell" in August, 1937, the medical testimony is to the effect that he was still suffering from the disease and that Dr. Reed was justified in treating him for it. Tryparsamide is a drug indicated by the profession in the treatment of cerebro-spinal syphilis.

The defendant maintains that there are two schools of medical opinion as to the continued use of tryparsamide after the discovery of optical disturbances. The first school suggests the continued use of tryparsamide regardless of such disturbances because it is believed by respectable medical authority that tryparsamide will help optical disturbances by helping the syphilitic condition. The other school believes that when complaint is made of visual trouble the treatment should be discontinued. It is therefore contended by the defendant that if he followed either one or the other of these theories he was not negligent.

The principle could have no application here for the reason that Dr. Reed has testified that when the plaintiff complained of his vision after two injections of tryparsamide the treatment was immediately discontinued and he was directed to go to an eye specialist for examination and treatment. This testimony commits Dr. Reed to the second school of medical opinion. He says that when eye disturbances make their appearance the usual practice directs that the tryparsamide be discontinued. In view of the contradiction of Dr. Reed by the plaintiff in this respect the important question the jury had to determine did not relate to the rule, that where there are two schools of thought in medical practice, if the practitioner follows one he cannot be negligent, but it did relate to whether the defendant properly and carefully followed the branch of medical opinion which he had adopted in this case. The jury resolved the question against him upon the conflicting testimony.

There is no difficulty about the law applicable to the case. We have stated and restated the principles. A

physician holds himself out as possessing the knowledge and ability necessary to the effective practice of medicine. He impliedly represents that he is keeping abreast of the literature and that he has adopted those techniques which have become standard in his line of practice. However, he is not an insurer, nor is he held to the highest degree of care known to his profession. The mere fact that he has failed to effect a cure or that his treatment has been deleterious will not raise a presumption of his negligence. He must exhibit only that degree of skill and diligence employed by the ordinary, prudent practitioner in his field and community, or in similar communities, at the time. *Alexander* v. *Hill* (Jan., 1940), 174 Va. 248, 6 S. E. (2d) 661; *United Dentists* v. *Bryan,* 158 Va. 880, 164 S. E. 554; *Ropp* v. *Stevens,* 155 Va. 304, 154 S. E. 553; *Hunter* v. *Burroughs,* 123 Va. 113, 96 S. E. 360; *Fox* v. *Mason,* 139 Va. 667, 124 S. E. 405.

██ Negligent practice of a physician in the diagnosis and treatment of a patient can be established only by expert testimony and if the proof leaves it equally probable that a bad result may have been due to a cause for which the defendant was not responsible as to a cause for which he was responsible the plaintiff cannot recover. *Hunter* v. *Burroughs, supra.*

The foregoing legal principles were set forth in numerous and extensive instructions to the jury.

██ Here, as in other negligence actions, the plaintiff must sustain the burden of showing that the negligent acts complained of constituted the proximate cause of his injury. As to the actual treatment administered by Dr. Reed, the verdict of the jury must be taken as a finding that the treatment consisted of eleven tryparsamide injections, spaced from four to five days apart. There is ample evidence for this conclusion of the jury. To establish liability on Dr. Reed's part, however, there must be testimony tending to prove that these tryparsamide injections were the proximate cause of the optic atrophy, and that they were given in contravention of the rules of good practice in that

community. If it is equally probable that the syphilis caused the loss of vision, the plaintiff's case must fail. But this is a jury question, and the jury, after proper instruction on this point, has found that it was not equally probable that syphilis caused the eye trouble but that the treatment used by the doctor was indeed the proximate cause. Our duty is limited to an examination of the evidence and a determination of whether it was sufficient to support such a finding.

The evidence discloses that it is well-known in medical circles that syphilis may cause serious eye trouble and even partial or total blindness. Despite its comparatively recent appearance on the medical scene, it is equally well-known that tryparsamide is a potent drug, and there is ample evidence from which the jury could reasonably believe, even without reference to the controversial Merck pamphlet (which will be referred to later), that it should be administered only under rigid ocular control. The testimony for the plaintiff discloses that the defendant failed in this respect.

Whether the plaintiff's partial blindness was caused by this negligent failure to desist from tryparsamide therapy in the face of increasing ocular disturbances, or whether it was due to the plaintiff's diseased condition, was one that had to be decided by the jury from the evidence at hand. The controversy here is not of the sort that can be settled with mathematical certainty, and the jury does not presume to speak the ultimate truth of the conflict, but only to make such findings as the preponderance of the evidence dictates. Although Dr. Burke and Dr. Kimbrough each states that in his opinion the atrophy was of syphilitic origin, both admit that it is impossible to tell by examination of an atrophied optic nerve whether syphilis or arsenical poisoning occasioned the incapacity. Indeed, both admit that their opinion here is based on mere deductive reasoning of this nature: syphilis causes eye trouble; this man had syphilis; therefore this man's eye trouble is caused by syphilis. It is apparent that important variables have been

omitted from this reasoning, and hence their testimony boils down to little more than a statement that optic atrophy may be occasioned by syphilis.

Since it appears that no amount of clinical research could determine which of the forces here at work caused the atrophy, it becomes the province of the jury to weigh the probabilities and to reach a verdict based on all the evidence. The jury had before it a plaintiff who had once had severe syphilitic trouble, but who had been given the most efficacious treatment known at that time, and whose doctor had told him he was cured. He had had no recurrences of syphilitic symptoms for fourteen years, and his eyes had been equal, during that period, to the most exacting and minute work. Seven years before the acts complained of he had been fitted with reading glasses, but the adjustment necessitated was slight and was attributable to his advancing years. Then on August 14, 1937, he fainted, and, despite a negative Wassermann, his physician treated him for syphilis, using a drug known to this physician to produce severe ocular disorders unless carefully administered. As these treatments progressed, this plaintiff complained of increasing visual disturbances—the first serious eye trouble of his life. In spite of this the physician continued the injections of the potent drug, as indicated by the plaintiff's evidence and established by the jury's verdict. Despite the physician's reassurances, the plaintiff became virtually blind. He then visited an eye specialist, who directed Dr. Reed to give him treatments calculated to offset the effects of the potent drug, but the loss of vision persisted. After more than a year had passed, the plaintiff underwent extensive examinations for the presence of syphilis, all of which proved negative.

As already indicated, the expert testimony establishes that the plaintiff's syphilis was of an incurable type, and further that syphilis often causes partial or total blindness. It is therefore clearly *possible* that the loss of vision here was caused by the syphilis. However, it also appears that tryparsamide therapy *often* causes visual disturbances.

If the blindness here were caused by syphilis, it was a mere fortuity that it should occur at this particular time, after so long a period of dormancy, while if it were caused by the persistent tryparsamide treatments, that was a predictable result, well-known to medical men. The court carefully instructed the jury in instruction no. 7 that if they believed it equally probable that the disease caused the impairment of vision there could be no recovery. It would seem that in weighing the probabilities here, under the law as given by the court, the jury was well justified in finding that it was the tryparsamide which was the proximate cause of the blindness. The plaintiff was not required to exclude by his proof the possibility of the injury having been the result of the prior syphilis. The weighing of probabilities was for the jury.

Much is made by the defendant of the tendency of cerebrospinal syphilis to crop out suddenly after a long dormant period. It is pointed out that it is similar to a "rat gnawing on a taut rope," which may suddenly sever the rope that has for many years borne a heavy load, and that syphilis may have a similar effect on the optic nerve. It was argued that the events of August 14, 1937, showed an outcropping of the old syphilis, and hence the period covered by the treatments was a natural one in which the "rope" might snap.

The plaintiff's fainting condition on August 14, 1937, as already stated, was followed by a pronounced headache, slightly elevated blood pressure, and incoherent speech, although there is some conflict as to these symptoms. In view of the plaintiff's age—he was nearly 62—and the oppressive heat prevailing at the time, and especially in view of the negative Wassermann, the jury had ample evidence from which it might conclude that these events were not sufficient proof of the recurrence of syphilis to justify the physician in administering tryparsamide in an uncontrolled manner. There is medical testimony that such treatments, persistently administered despite increasing loss of vision, may be proper only in the case of an extremely aggravated

condition, and there is much evidence from which the jury might find that here no such aggravated condition existed.

The folder or pamphlet previously adverted to, which came with each dose of tryparsamide, was offered in evidence by the plaintiff. It contained detailed directions for the use of tryparsamide. In it a chapter is entitled "Ocular Disturbances." This pamphlet was prepared by Merck & Company, Inc., and purports to prescribe a treatment for "Neurosyphilis with Tryparsamide Merck," which has been accepted by the American Medical Association, according to its stamp of approval printed on the flyleaf. Tryparsamide is manufactured under a license issued by the Rockefeller Institute for Medical Research. It is plainly set forth in the pamphlet that when visual acuity is reduced or limitation of the visual field occurs there should be immediate cessation of the drug until recovery has taken place.

When the pamphlet was offered it was objected to by the defendant on the ground that it was hearsay. However, Dr. Reed testified that "he got all the literature he could on the subject" and was entirely familiar with this literature. He said, "I followed closely the schedule as outlined and recommended by pamphlet put out by Merck." Thus it is observed that he claims to have adopted and followed the identical directions contained in the pamphlet. Under these circumstances it is quite clear that he was not prejudiced by the introduction of the pamphlet.

In addition to the foregoing, the court out of an abundance of caution gave the jury instruction no. 12, to the effect that they could consider the pamphlet only for the sole purpose of showing "that Dr. Reed had knowledge of the information contained in the circular (pamphlet). It is not evidence to show that it is improper to give tryparsamide without having an oculist examine the eyes, and if you believe that it was customary, among doctors in this community engaged in a similar line of practice, to give the tryparsamide without an eye examination, you shall find for the defendant."

If any error were committed in admitting the pamphlet, instruction 12 rendered it entirely harmless.

Instruction A, granted by the court, reads as follows: "The court instructs the jury that in considering and weighing the testimony of experts in this case, it is your duty to also consider and weigh the same in connection with all the other evidence in the case and all facts and circumstances established by the preponderance of the evidence, and you should apply sound judgment to the sifting and weighing of the evidence in order to reach a verdict."

The defendant insists that the jury was entirely limited to the testimony of medical experts of good standing in determining the question of Dr. Reed's negligence and that the instruction violates that fundamental rule of law.

In *Hunter* v. *Burroughs, supra,* the court said that the question of proper practice in examination and treatment is to be established by experts.

Whether the measure or standard of medical care has been exercised can only be decided upon expert medical testimony, and the jury were so instructed in instructions nos. 1 and 4. When these instructions were considered with instruction A and applied to the evidence they in effect told the jury that whether the defendant was guilty of negligence in failing to exercise the proper skill and professional care in diagnosing and treating the plaintiff was to be determined upon the testimony of experts, but that they might consider the non-medical testimony in deciding non-medical questions, such as whether Dr. Reed discontinued the tryparsamide when the plaintiff complained of his eyes, whether only two injections were given him as stated by Dr. Reed or eleven injections as testified to by the plaintiff, and whether Dr. Reed told Dr. Diehl he had given the plaintiff nine doses of tryparsamide or two doses of it. These were important questions and did not depend for solution upon expert testimony. They had to be resolved by the jury upon the conflicting testimony. We find no valid objection to instruction A.

 Objection was made by the defendant to instruction B. This instruction embraced the legal rule to the effect that when a physician undertakes to administer to a patient it is his duty to exercise reasonable care and skill in making examinations and tests which are reasonable in order to diagnose the disease and to exercise like care and skill to ascertain the probable effects of the drugs prescribed and to observe the precautions if any are indicated. If as a result of his negligent failure in these respects the patient is injured without negligence on his part the physician is liable.

The objection to the instruction when offered was that there was no evidence that it was customary in the community to cause an examination or test to be made, nor to diagnose the disease; that there was no evidence that the defendant failed to exercise reasonable care to ascertain the probable effects of the drug or that he failed to use such care in administering the treatment.

 The medical testimony quite clearly discloses that in cases of this nature tests and examinations are usually made to ascertain the disease from which a patient is suffering. The testimony for the plaintiff indicated that the defendant failed to use the proper skill in treating him. When instruction B is considered with the other instructions given, especially with those granted for the defendant specifically defining the duty owed by a physician to his patient, the challenged instruction was proper.

Numerous objections were made by the defendant to other instructions and many exceptions taken to the failure of the court to grant instructions as offered by him. We have carefully considered these and have analyzed the instructions as a whole and are of opinion that the court fairly and fully instructed the jury.

The judgment is affirmed.

*Affirmed.*