# Richmond

## Foy Vann v. Arthur Gardner Harden

### AND

## Foy Vann v. Ernest R. Harden, Jr.

April 26, 1948.

Record No. 3326.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley and Miller, JJ.

The opinion states the case.

*Jas. G. Martin & Sons* and *Leigh D. Williams*, for the plaintiff in error.

*William G. Maupin* and *Willcox, Cooke & Willcox*, for the defendants in error.

GREGORY, J., delivered the opinion of the court.

Two actions at law by notice of motion were instituted in the trial court in November, 1945,—one in behalf of Arthur Gardner Harden, an infant seventeen years of age, suing by his father, Ernest R. Harden, Jr., as his next friend, and the other in behalf of the father, Ernest R. Harden, Jr.. In both, Dr. Foy Vann, an orthopedic surgeon was the defendant, and both actions were grounded upon the alleged negligence of Dr. Vann in the treatment of Arthur Gardner Harden. In the latter's case the damages claimed were $25,000, and in the father's case the damages claimed for deprivation of his son's services and medical expenses were fixed at $5,000.

The son had fractured his leg in a football game on October 19, 1944, and some time later the leg had to be amputated. Afterwards, on account of the amputation, the

original notice of motion in his case was amended raising the amount of damages from $25,000 to $50,000. The cases were tried together before the Hon. O. L. Shackleford, judge of the trial court, beginning on the 19th and continuing through the 22nd day of November, 1946.

Upon the completion of the evidence for the plaintiffs the defendant moved to strike it, and at the close of all the evidence a similar motion was made, but both motions were overruled by Judge Shackleford. Whereupon, the jury returned a verdict of $20,000 in favor of Arthur Gardner Harden, and a verdict of $5,000 in favor of Ernest R. Harden, Jr. Motions were made to set aside the verdicts but in the meantime Judge Shackleford had become ill and Hon. Laurence W. I'Anson, judge of the Court of Hustings for the city of Portsmouth, was designated to hear the motions. After mature consideration Judge I'Anson overruled them and entered judgment on the verdicts on July 10, 1947.

The fracture of Arthur G. Harden's leg was between the knee and the ankle. It was a simple one with slight comminution or splintering. After the father had been notified of the accident he immediately got in touch with Dr. Vann and engaged him to treat his son who had been taken to the Norfolk General Hospital. Dr. Vann reduced the fracture and set the leg in a plaster of Paris cast, in the customary way, with the padding and gauze between the cast and the leg.

On the next day, Friday, October 20, Dr. Vann visited his patient, and again about 10:00 a. m. on Saturday the 21st of October. On October 20 when Dr. Vann saw the boy the father was present. He and the son told Dr. Vann that the son was suffering excruciating pain in the injured leg and that he had no feeling in his toes. Dr. Vann, according to the plaintiffs' evidence, made no examination of the cast and did nothing about it. Again on October 21 both the father and son made a similar complaint to Dr. Vann when he called. The pain in the ankle had become continuous and unendurable. The doctor was told that there

was a throbbing sensation in the ankle of the patient, that it felt as though a tight band were around it. and that he had no feeling in his toes. The father suggested that the cast was too tight. Dr. Vann, in very emphatic language, said it was not. However, according to the plaintiffs' evidence, he made no examination of the cast or leg and did nothing to alleviate the pain on this occasion. On October 22, which was Sunday, Dr. Vann left the city for a week without advising either the patient or his parents of his intention to leave. He did not make any provision for the patient during his absence and did not communicate with him or leave any instructions for any other doctor to take care of the case while he was away.

On October 21, which was the day of the last visit of Dr. Vann before leaving on his trip, the patient's condition was such that his temperature was normal at midnight on the 19th, but rose to 101.6 at four p. m., on the 20th; four hours later it was 100.8; on the 21st it was 101, then at eight a.m. it was 100.8. These temperatures were noted on the chart of the patient. The chart discloses that on the 21st the white corpuscles blood count showed 16,000, and the neutrophile count was 77 per cent. For 24 hours prior to Dr. Vann's last visit to his patient on October 21 the patient had been administered morphine on five separate occasions for the alleviation of the pain. On the night of October 21 Arthur's temperature varied from normal to 102, and during the next four days it fluctuated, sometimes being sub-normal, and at other times running up to 103. The pain in the ankle was not alleviated by the administration of morphine. On Sunday, October 22, the father tried to reach Dr. Vann but without success. He also attempted, but failed, to secure the services of another doctor. During this time Arthur was suffering unendurable pain. On the 23rd Mr. Harden learned that Dr. Vann had left the city but had left no instructions in regard to Arthur. Late in the day on the 23rd Mr. Harden succeeded in reaching Dr. William A. Simpson, another orthopedic surgeon, and requested him to look after his son during Dr. Vann's

absence. On October 24 Dr. Simpson saw the patient for the first time, and he immediately bivalved the cast, cutting it away from the ankle bone and relieving the pressure. At this time Dr. Simpson found the foot to be swollen and a nerve had become involved from the pressure of the cast. This was indicated by the lack of sensation in the toes.

During the time that Dr. Simpson treated the patient there was persistent pain and evidence of acute infection, marked fluctuations of temperature ranging from 98 degrees to 103, and in order to ascertain whether the infection was coming from the lungs the patient's chest was x-rayed for pneumonia or other respiratory trouble. These produced negative results. On October 30 when Dr. Vann returned he was again requested to examine the cast and leg but declined to do so, and on the same day discharged the patient from the hospital. The patient was carried to his home at Virginia Beach on the 31st in an automobile and was confined there to his bed. The rise in temperature persisted and he continued to endure extreme pain in his ankle. The father called Dr. Vann on November 7 and informed him of the condition of the patient and requested him to come to see him. The doctor refused to go and told Mr. Harden that there was nothing wrong with the boy's leg. He suggested that Dr. Corpening, a general practitioner at Virginia Beach, be called in to check his general condition.

Dr. Corpening had been a general practitioner at Virginia Beach for twenty years, and she was the family physician of the Harden family. Mr. Harden again appealed to Dr. Simpson and told him that Dr. Vann had refused to see the patient though he was suffering intense pain. He requested Dr. Simpson to call, which he did. Dr. Simpson consulted with Dr. Corpening and split the cast, removing the upper portion of it so that all pressure was relieved. The ankle was swollen, as was the entire leg, and Dr. Simpson observed two necrotic areas just above the ankle bone. These never healed. They were about the size of a quarter on either side of the ankle.

Dr. Simpson testified that the cast was completely bivalved on November 7 for the purpose of relieving all pressure and that the necrosis was caused by pressure on the nerves, created by the cast. He stated that the possibility of swelling with the result that the cast might become too tight, even though it were originally properly applied, should be anticipated by a physician in charge of such a case and that any unyielding cast applied to a broken limb ought to be viewed with suspicion and examined to see whether it had become too tight.

After the cast was bivalved on November 7 the patient remained at home in bed until November 27, at which time he was carried to the office of Dr. Simpson and the cast removed. According to the plaintiffs' evidence, at that time the whole leg was swollen and the ankle extremely swollen. It looked as though a tight band had been put around the ankle. One witness testified that the foot was distorted beyond anything she had ever seen and was a most horrible looking thing. The evidence discloses that it was discolored and swollen badly and that when the cast was removed the leg began draining at the ankle.

The condition of the leg and foot became so bad that it was necessary to take the patient back to the Norfolk General hospital for physiotherapy treatments which were continued until the 25th of December, 1944. At that time the leg had become greatly swollen and the temperature of the patient increased. He had been treated by Dr. Corpening with sulfa drugs in an effort to reduce the temperature. On December 29, Dr. Simpson diagnosed the case as cellulitis or gas bacillus infection. An incision was made and a great deal of necrotic tissue and pus was evacuated. Later an operation had to be performed at the hospital by Dr. C. C. Smith, a surgeon. This operation consisted of making several incisions in the leg and inserting drainage tubes.

The patient's condition continued to go from bad to worse, the leg continued to drain, and on August 27, 1945, he was returned to the hospital for treatment by Dr. Smith.

He was again returned to the hospital for treatment on October 23, 1945. Upon both of these occasions he remained in the hospital for quite a long time. Upon the last occasion Dr. Smith again operated upon the leg for the purpose of draining it. At that time a hole three inches in diameter, reaching to the bone, had developed from the sloughing of the flesh. It would not heal. Later Arthur was discharged from the hospital, and went to the University hospital at Charlottesville and placed himself under the care of Dr. Funsten, who is an outstanding orthopedic surgeon. Arthur was also desirous of continuing his education at the University. Arrangements were made for him to see Dr. Funsten from time to time while he remained there at school. His leg never ceased to drain, and it was finally amputated by Dr. Funsten in July, 1946. From the time the leg was broken he was never able to walk on it, except for a short time, at the suggestion of Dr. Smith, he attempted to walk with the use of a cane but without success. From the time of the fracture on October 19, 1944, until the amputation in July, 1946, the patient's condition continued to grow worse.

Prior to the amputation and while he was at the University, Dr. Funsten cleaned and dressed the leg two or three times a week. In the summer of 1946 he attempted a skin graft to close the hole on the ankle but it was unsuccessful. After the leg had been amputated, a short time later, another amputation was necessary, and Arthur remained hospitalized in the University hospital for more than two months. The amputation became necessary as a final result of the infection of the leg.

There is medical testimony that the patient was not in proper condition to have been discharged from the hospital on the 21st day of October, at which time Dr. Vann authorized his discharge. As we have stated, he was not actually discharged until October 31.

There is also medical testimony to the effect that on October 21, 1944, the last day upon which Dr. Vann saw his patient before leaving on his trip, there was an indication

that an infection existed and that a doctor with an average degree of learning and skill, practicing in the community, should have attempted to ascertain the cause of the infection, and especially should have examined the injured leg and the cast. There is other medical testimony to the effect that if a physician intends to leave a case, it is his duty to notify the patient, or his parents in this case, of his intention to leave, and that he should make some provision to put his patient in charge of some reputable physician. The symptoms existing on October 21,—that is, the fluctuation in temperature, the continuous pain in the ankle, numbness of the toes, and other circumstances—indicated that a physician, in the exercise of proper skill, should have examined the cast.

There is also medical testimony to the effect that the amputation of the patient's leg was due to a continuation of the same conditions as were brought about by the swelling of the leg and the failure of Dr. Vann to promptly relieve the pressure by removing or cutting the cast.

The germ of cellulitis enters the body through a break in the skin in many cases, and necrotic spots are caused by persistent pressure. These spots were open and receptive to the entry of germs.

The plaintiff in error contends that there is no evidence upon which the verdicts can be sustained, and that they were founded only on sympathy for the unfortunate boy who lost his leg and for the father who had incurred large expenses. The verdicts must be sustained if there is enough evidence to support them. Two distinguished trial judges have carefully considered the evidence and they have reached the conclusion that it is sufficient.

It is contended by Dr. Vann that when he left on October 22, 1944, the boy was in the hospital receiving good treatment from the interns and nurses and on the 24th was directly under the supervision and care of Dr. Simpson, another orthopedic surgeon of high standing; and that if he, Dr. Vann, had been in attendance he could have done no more for the patient than was done. He further contends

that the fracture was properly reduced and the cast properly applied.

It is not contended by counsel for the defendants in error that the fracture was not properly reduced or that the cast was improperly applied. Their contention here is that after the application of the cast Dr. Vann neglected to pay heed to certain conditions that arose in a very short time after the cast was applied, namely, the temperature of the patient which was fluctuating, the white blood count which had gone to 16,000, and the neutrophile percentage which had reached 77. These conditions appeared to Dr. Vann on October 21, when he read the hospital chart. In addition to these things which unmistakably were known to Dr. Vann and which indicated an infection, the leg was very painful and swollen. The toes had no feeling in them due to the nerve involvement brought about by the pressure from the cast. And when the father and the patient requested that the doctor examine the cast he refused to do so. This was the patient's condition on October 21. The next day, as already stated, Dr. Vann, without giving the patient or his father any notice and without securing another doctor for the boy, left the city and did not return for eight or nine days, during which time the condition of the patient grew progressively worse.

The facts just related are without contradiction except that Dr. Vann says the father and son never complained about the cast or requested that it be examined. The unerring *indicia* of infection we have related, all fully known to the doctor, made it his absolute duty to examine the cast and try to find the cause and eliminate it. Instead, he not only did nothing when these danger signals were flying in his face, but as they became more pronounced, he, on October 21, absented himself until October 30.

In cases of this nature there is no difficulty about the law. It is simple and well-settled, although not always easy of application. A physician is not a warrantor or insurer of a cure. His contract is to treat the case with reasonable diligence and skill.

■ "A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing, that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery.

■ "Upon consenting to treat a patient it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. * * *" Shearman and Redfield on Negligence, Rev. Ed., Vol. 3, section 614.

In *Fox* v. *Mason*, 139 Va. 667, at page 671, 124 S. E. 405, this court approved the general rule and quoted from the Vermont court as follows:

"In *Rann* v. *Twitchell*, 82 Vt. 79, 71 A. 1045, 20 L. R. A. (N. S.) 1030, the court said:

" 'One who holds himself out as a specialist in the treatment of a certain organ, injury, or disease is bound to bring to the aid of one so employing him that degree of skill and knowledge which is ordinarily possessed by those who devote special study and attention to that particular organ, injury, or disease, its diagnosis, and its treatment, in the same general locality, having regard to the then state of scientific knowledge.' "

See *United Dentists* v. *Bryan*, 158 Va. 880, 164 S. E. 554, and *Reed* v. *Church*, 175 Va. 284, 8 S. E. (2d) 285.

We have also approved the general rule to the effect that the same degree of skill and care is to be exercised by a physician in the necessary subsequent treatment of the patient following an operation. See *Fox* v. *Mason, supra,* at page 672.

■ After a physician has accepted employment in a case it is his duty to continue his services as long as they are necessary. He cannot voluntarily abandon his patient. Even if personal attention is no longer necessary in the

treatment of an injured limb, the physician, if the case calls for it, must furnish the patient with instructions as to its care, and his failure to do so might become actionable negligence. See Shearman and Redfield on Negligence, Rev. Ed., Vol. 3, section 622.

From the evidence the jury reasonably could have found Dr. Vann guilty of actionable negligence in several respects. It could have concluded that on October 20 and 21, 1944, the doctor should have rendered some kind of treatment when he was notified by the father and the boy of the great pressure of the cast and of the excruciating pain. The undisputed medical testimony previously noted is that in cases of this kind the swelling and pressure are to be anticipated by the physician and the cast examined and bivalved if necessary. The failure to do anything or render any treatment on those days could have justified the conclusion by the jury that the doctor was guilty of actionable negligence, especially when considered in the light of the information disclosed on the patient's chart.

Failing or refusing to see the patient from October 21 to 30, which was a very critical period, could have been found by the jury to be negligence which proximately contributed to the patient's great pain and suffering and the eventual loss of his leg.

Again on October 30, the failure or refusal of Dr. Vann to render any treatment after he had been advised of the serious condition of the patient, and then sending him home without making any future provision or giving any directions for his care and treatment, might have afforded reasonable grounds for the jury to have found negligence on the doctor's part in those respects.

Finally, on November 7, the doctor failed to respond to the call for medical assistance made by the father for the boy when the doctor, by his own admission, had not released the case nor had he been discharged from the obligations he assumed when he took the case. At that time it was his duty to continue attending and treating the

patient. His failure in this respect might have been found to have been negligence.

The evidence disclosed without contradiction that from October 19, when the cast was applied, Dr. Vann rendered the patient no treatment whatsoever, although he knew that the patient was having serious trouble.

From the medical testimony the jury were warranted in finding that the proximate cause of the amputation was due to the negligence of Dr. Vann, or at least that his negligence efficiently contributed to the final and serious result. There was sufficient evidence for a finding by the jury that cellulitis made the amputation necessary, that the germs of this disease entered through the necrotic spots on the ankle, that the necrotic spots were caused by the pressure of the cast on the nerves and from the lack of circulation, and that these things could have been avoided if Dr. Vann, on October 21, 1944, had exercised the care the law required of him. This conclusion is strengthened by the absence of any explanation by Dr. Vann of some other reasonable way in which the germs entered the plaintiff's leg.

We are of opinion that the evidence sufficiently supports the verdicts.

Complaint is made of the failure of the plaintiff to call Dr. Funsten as one of their witnesses. It is charged that if he had been called his testimony, presumptively at least, would have been adverse to them. The plaintiffs introduced the testimony of three physicians and there was little or no variance in their testimony. If Dr. Funsten had been called it is likely he would have substantially agreed with these three physicians. As a matter of fact, Dr. Vann himself agreed with them on the most important features of the case. Dr. Funsten was equally available to Dr. Vann. The well-recognized rule regarding the failure of a party to call a certain witness creating a presumption against such party has no application in the instant case.

Counsel for Dr. Vann objected and excepted to every instruction offered and given on behalf of the plaintiffs. Most of these objections are founded on the alleged absence of negligence and proximate cause. In this counsel is in error. These two material questions were fairly submitted to the jury upon sufficient evidence in many instructions offered and granted on behalf of both sides. There was little conflict in the testimony.

The issues for the jury were few and simple. They demanded no great number of instructions with complicated recitals. Many instructions might have confused the jury. Those given at the instance of the plaintiffs stated in plain and clear language the elementary principles controlling the case. They defined the care and skill required of a physician under the circumstances, the duration of his employment; and they told the jury that if they believed he failed to perform his duties and such failure was the proximate cause of the loss of the leg, he would be liable to respond in damages. Another instruction told the jury that if the doctor absented himself from October 21 to October 30, without notice to the plaintiffs and without making any provision for the patient during his absence, and if during that time the patient required medical attention which might or should have been known to Dr. Vann, then his conduct in leaving was negligence, and if it were the proximate cause the defendant was liable. Finally, the court told the jury that they had a right to consider the nonmedical evidence in weighing the medical evidence. (*Reed* v. *Church*, 175 Va. 284, 8 S. E. (2d) 285.)

■ The principles, as defined in the instructions granted for the plaintiffs, were correct and applicable to the facts in the instant case. The instructions were plain and readily understandable and laymen could easily ascertain the law from them and apply it. No doubt the jury believed and accepted the evidence offered for the plaintiffs. It was largely free from conflicts and preponderated.

Counsel for the defendant offered 23 instructions, 10 of which were granted. Several of these were counter

instructions, others emphasized the burden of proof as to negligence and proximate cause. Twelve instructions were refused. We have examined all of them and find that those refused were properly refused.

The judgment is affirmed.

*Affirmed.*

EGGLESTON, J., dissenting.

In my opinion the evidence fails to show that Dr. Vann was guilty of any negligence which caused the loss of young Harden's leg. There is an entire lack of evidence that the infection which developed in the limb and necessitated the amputation was caused by anything which the doctor did or failed to do.

As the majority opinion points out, "It is not contended by counsel for the defendants in error that the fracture was not properly reduced or that the cast was improperly applied. Their contention here is that after the application of the cast, Dr. Vann neglected to pay heed to certain conditions," namely, the fluctuation in the patient's temperature and the change in his blood count, which developed shortly thereafter.

It seems to be agreed that the amputation of the leg was necessitated because of cellulitis, which one of the doctors described as "an infection of the subcutaneous tissues." The majority opinion outlines the chain of causation thus: "There was sufficient evidence for a finding by the jury that cellulitis made the amputation necessary, that the germs of this disease entered through the necrotic spots on the ankle, that the necrotic spots were caused by the pressure of the cast on the nerves and from the lack of circulation, and that these things could have been avoided if Dr. Vann, on October 21, 1944, had exercised the care the law required of him."

It is said that there is evidence to warrant a finding by the jury that Dr. Vann was guilty of negligence which brought about the unfortunate result in several respects.

First, it is said that Dr. Vann failed to see the boy from Saturday, October 21, until Monday, October 30, and that in the meantime the physician was absent from the city and had left no other doctor in charge of the patient.

The testimony is undisputed that when Dr. Vann saw the boy on Saturday, October 21, his temperature was normal and his condition was such that the doctor thought that the patient could be taken home at the convenience of his family. When the boy's temperature again rose after Dr. Vann left the city, Dr. William A. Simpson, a thoroughly qualified orthopedic surgeon, was called in. He first saw the boy on Tuesday, October 24, cut the cast, and relieved the pressure on the swollen limb. When the patient's subsequent condition indicated an infection, Dr. W. B. Newcomb, an eminent diagnostician, was called in. They suspected pneumonia or a blood clot in the lung, but x-rays negatived these. The actual cause of the infection then indicated was not disclosed in the evidence. Certainly it was not shown that the infection which subsequently necessitated the amputation was then present.

In the meantime Dr. Simpson saw the patient daily until Dr. Vann returned on Monday, October 30. At that time the boy's condition had improved to such an extent that Dr. Vann recommended that he be removed to his home at Virginia Beach.

There is no evidence that if Dr. Vann had remained in Norfolk and had seen the boy every day during the week he was absent, he or any other physician could have done more for him than was accomplished by and under the supervision of Dr. Simpson.

Next, it is said that when the boy's parents called Dr. Vann on November 7, and requested that he come to see him at his home at Virginia Beach, Dr. Vann declined to do so and suggested that the Hardens' local family physician, Dr. Corpening, be called in. The Hardens called Dr. Corpening, who in turn called in Dr. Simpson, and the two physicians split the cast. There is no evidence that Dr.

Vann could or would have done more if he had answered the call.

While these two incidents, and certain evidence of the apparent indifference of Dr. Vann to the boy's suffering (which the doctor denied), were well calculated to appeal to the prejudice of a jury, it is perfectly manifest that they had no causal connection with the result complained of.

In the final analysis the gist of the plaintiffs' case is that Dr. Vann failed to give the boy proper medical treatment on October 20 or 21. As the majority opinion puts it, the jury could have concluded that at this time "the doctor should have rendered *some kind of treatment* when he was notified by the father and the boy of the great pressure of the cast and of the excruciating pain." (Emphasis added.)

Presumably, the "kind of treatment" referred to is that the cast should have been cut, because none other is suggested either in the opinion or in the briefs. But whether that was necessary or proper was a matter of proof to be established by medical testimony.

The undisputed medical testimony here is that a fracture of both bones of the leg is painful and causes high temperature; that the application of a proper cast frequently causes pressure; and that necrotic areas will often develop despite the highest care on the part of the physician.

It should be remembered that the cast was applied—and admittedly properly applied—on October 19. There is no medical testimony whatsoever that it should have been cut on either October 20 or 21, or at any time prior to October 24, when Dr. Simpson did so.

But that is not all. There is not the slightest evidence in the record that if the cast had been cut on October 20 or 21, the cellulitis would not have developed or that the patient's leg would have been saved. Indeed, as I see it, there is no evidence that Dr. Vann did or failed to do anything which caused the cellulitis.

The undisputed evidence is that the cellulitis did not

develop until the latter part of December. It was first observed by Dr. C. C. Smith, a surgeon who was called in by Dr. Corpening on December 29, and who operated on the leg and inserted drainage tubes therein.

Dr. Smith is an eminent surgeon who has practiced in Norfolk for many years. He was called as a witness for the plaintiffs below and when asked the direct question whether, in his opinion, the "cast had anything to do with the cellulitis which developed some time during December," replied: "The time that had elapsed between the bivalving of the cast and the beginning of the cellulitis in December was a very long time, and I do not see how the cast could have caused the cellulitis that developed in December." Dr. Vann testified to the same effect.

It is true that Dr. Corpening, who is a general practitioner and who admitted that she had done no "bone work at all," when asked the same question replied: "Well, I don't see what else could cause it. I don't think it was due to infection." She gave no professional reason or theory how or why the cellulitis could have been caused by the previous pressure of the cast when, as she said, there was no infection on November 7.

In my opinion such testimony constitutes at best a mere scintilla of proof of causal connection (*Hardy-Burlingham Min. Co.* v. *Baker*, C. C. A. 6, 10 F. (2d) 277, 281), and is not sufficient to sustain a verdict in this State (*Johnson* v. *Richmond, etc., R. Co.*, 160 Va. 766, 777, 169 S. E. 603).

Apparently the majority adopts the opinion of Dr. Corpening, for it says that "This conclusion is strengthened by the absence of any explanation by Dr. Vann of some other reasonable way in which the germs entered the plaintiff's leg.'"

Since Dr. Vann is the defendant in a tort action, I had thought that the burden was on the plaintiffs to establish the necessary causal connection between the alleged acts of negligence and the result complained of, and not on the physician to prove that "the germs entered the plaintiff's

leg" in some manner for which the physician was not responsible.

Dr. Corpening did not testify that the cellulitis would have been avoided if the cast had been cut on October 20 or 21. Moreover, there is no testimony by this witness, or any other, that the necrotic areas through which the germs of infection are supposed to have entered the blood stream were caused by the negligence of Dr. Vann. On the contrary, as has been said, the medical experts agree that such areas frequently result from the application of a proper cast.

The practice of medicine is not an exact science. It is a matter of common knowledge that during the convalescence of a patient from an operation or illness, despite the highest medical skill and attention, complications may arise from unknown causes which will result in disability or death. To say that the physician must guarantee against such results would make him an insurer. The law does not put such a burden upon him. Liability of the physician depends upon proof of negligence which is the proximate cause of the untoward result complained of. The evidence here falls short of this requirement.

For these reasons I am of opinion that the judgment complained of should be reversed and a final judgment entered in favor of Dr. Vann.