Margaret DIETZE, Plaintiff,

v.

M. Kirwan KING, Defendant.

Civ. A. No. 2581.

United States District Court
E. D. Virginia,
Norfolk Division.
June 23, 1960.

Sidney H. Kelsey, Norfolk, Va., for plaintiff.

Williams, Cocke, Worrell & Kelly, Thos. R. McNamara, Norfolk, Va., for defendant.

WALTER E. HOFFMAN, District Judge.

This is an action for malpractice in which the plaintiff contends that defendant, an admittedly capable surgeon enjoying an outstanding reputation in this community, negligently left a sponge in the operative wound following a radical mastectomy for the removal of a breast cancer, and thereafter negligently failed to render proper post-operative treatment.

The operation was performed on January 24, 1957. Plaintiff remained in the hospital until February 2, 1957, and subsequently visited defendant's office on numerous occasions until March 23, when she, with knowledge of defendant, left Norfolk and, after spending approximately ten days in Vermont, sailed for England. Following her arrival in England, X-rays were taken and the presence of a linear opaque shadow of metallic density was noted in the upper part of the right axilla. She was immediately hospitalized and the surgical sponge was removed from the apex of the axilla on April 17, 1957.

The issues presented may be generally summarized and discussed as follows:

(1) Under the law of Virginia, does the doctrine of *res ipsa loquitur* apply in cases involving a surgical sponge in-

advertently left in the body following an operation of this type?

(2) Assuming the application of *res ipsa loquitor* doctrine, what is the effect of same in Virginia?

(3) Has negligence been proven under the peculiar facts and circumstances of this case?

(4) Was the defendant guilty of negligence in failing to render proper post-operative treatment subsequent to March 21, 1957, when defendant noted the possibility of a foreign body in the operative wound and took no action thereafter and, if such was negligence, what damages should be awarded the plaintiff?

### Applicability of Res Ipsa Loquitur Doctrine

While there are no Virginia decisions covering a situation in which a physician has left a foreign body in an operative wound, it seems clear from the tenor of other cases that Virginia would, under such circumstances, invoke the *res ipsa loquitur* doctrine. Absent the application of *res ipsa loquitur*, the rule in Virginia is clear that the negligent practice of a physician in the diagnosis of a patient can be established only by expert testimony, and if the proof leaves it equally probable that a bad result may have been due to a cause for which the defendant was not responsible as to a cause for which he was responsible, the plaintiff cannot recover. Reed v. Church, 175 Va. 284, 8 S.E.2d 285; Hunter v. Burroughs, 123 Va. 113, 96 S.E. 360; Fox v. Mason, 139 Va. 667, 124 S.E. 405; Alexander v. Hill, 174 Va. 248, 6 S.E.2d 661. But Virginia recognizes that a malpractice case may fall within the scope of *res ipsa loquitur*, thus eliminating the necessity of procuring expert testimony in the initial stages of proof. Henley v. Mason, 154 Va. 381, 153 S.E. 653.

A clearer case for the application of the doctrine in an action for malpractice cannot be shown. There are some authorities to the effect that the surgeon's failure to remove a sponge or other foreign substance from an incision constitutes negligence *per se*,[1] but the general rule is that the jury, or trier of fact, should be left to determine whether such failure is tantamount to negligence.[2] In the absence of a controlling Virginia decision, it is believed that a factual issue is presented under such circumstances without the aid of expert testimony. The very nature of the omission in leaving a sponge or other foreign body in the operative wound following an open operation commands the invocation of the doctrine of *res ipsa loquitur*.

Defendant relies upon Hunter v. Burroughs, supra, which pertains to the use of X-ray. The application of X-ray to a patient involves a standard with respect to the technique or mechanical operation of the apparatus, as well as professional skill and knowledge as to the diagnosis and treatment. We know, as a matter of common knowledge, that in the treatment of cancer and other diseases it is often necessary to use X-ray extensively, and in some instances X-ray burns may be the result. To apply the doctrine of *res ipsa loquitur* in the use of X-ray would do violence to the medical profession and subject practitioners to a handicap too hazardous to carry. The standard for the measure of skill exercised by the physician or surgeon should not, in such a situation, be left to the whim or caprice of a jury, or trier of fact, upon non-expert evidence.

However that may be, all parties concede that in a radical mastectomy operation no sponge or other foreign substance should be left in the operative wound. The result does not *per se* establish negligence, but it does permit an inference of negligence.

### The Effect of Res Ipsa Loquitur in Virginia

In Hamilton v. Southern Ry. Co., 4 Cir., 162 F.2d 884, Judge Soper discussed the effect of the *res ipsa loquitur* doctrine in Virginia. The Virginia

1. 65 A.L.R. 1030; 162 A.L.R. 1303.

2. 65 A.L.R. 1028.

authorities are considered at length and need not be repeated.[3] In short, the application of the doctrine results in the following steps:

(1) It avoids a directed verdict for the defendant at the close of plaintiff's evidence as an inference of negligence is permitted, but, even though the defendant offers no evidence, a verdict for the plaintiff does not necessarily follow.

(2) It avoids a directed verdict for the defendant at the close of all of the evidence, unless the defendant offers *uncontradicted* evidence which, if true, explains the accident and shows that it was not due to negligence on defendant's part, or that the question of negligence is in equipoise.

(3) It never has the effect of shifting the burden of proof as to negligence. Thus the inference or presumption of negligence raised by the application of the doctrine is entirely overcome where properly refuted by sufficient evidence.

The present case was heard by the Court without a jury. The issue of negligence remains a factual matter upon a consideration of all of the evidence.

The Operative Negligence in This Case

The difficulty with plaintiff's theory as to defendant's operative negligence is that she relies heavily upon the "result." Of course it is not the practice in the community for competent surgeons to leave a sponge in the operative wound following an open operation. There is, however, evidence to the effect that sponges are sometimes left in the body after an operation, even though the patient is in the hands of an expert surgeon.

The defendant did not cause a sponge count to be taken at the time of plaintiff's operation. The record does not reflect that, with respect to a radical mastectomy, sponge counts are customarily made by equally competent surgeons.

The result of this case may have brought about a change of practice on the part of surgeons in this community—and undoubtedly the sponge count, although not perfect, affords an added protection to the patient—but we are here dealing with the highest degree of diligence and skill which is common to and exercised by the average competent surgeon as of the date of the operation. The fact that a few surgeons do use the sponge count, while a substantial majority did not at the time in question, falls short of establishing a common practice in the field.

Defendant's failure to remove the surgical sponge was due, in the main, to two basic reasons. In the first place, the sponge was placed in a small "pocket" in the arm pit and was essentially obscured by muscles. More important, however, is the fact that, at about the midway point of the operation, plaintiff's blood pressure dropped to 90/70 which is borderline for shock. Following the operation, plaintiff did go into actual shock when her blood pressure fell to 70/50. Realizing the danger of death on the operating table, defendant reduced the average time of the operation by approximately 20 minutes. His prime purpose at that stage of the operation was to complete the same and get the patient off the operating table as early as possible. With the patient in poor condition, the requirement of an intensive search for a surgical sponge must be balanced with the danger of death, particularly when we know that a sponge remaining in the body in this operation will not cause death.

The defendant and his assistants looked for the sponges. That they did not look or feel enough is apparent from the result. But under the circumstances of this particular operation a finding of negligence does not necessarily follow. Other operations, or like operations not complicated by the patient's condition, could bring about a contrary conclusion.

3. Anderson v. Sisson, 170 Va. 178, 196 S.E. 688; Virginia Electric & Power Co. v. Lowry, 166 Va. 207, 184 S.E. 177; Stephens v. Virginia Electric & Power Co., 184 Va. 94, 34 S.E.2d 374; Norfolk-Southern R. Co. v. Tomlinson, 116 Va. 153, 81 S.E. 89; Hines v. Beard, 130 Va. 286, 107 S.E. 717.

On this issue of fact, the Court finds that negligence has not been established by this record.

### Negligence in Post-Operative Treatment

Following plaintiff's discharge from the hospital on February 2, 1957, she made numerous visits to defendant's office. She advised defendant that she planned to leave Norfolk permanently on or about March 23 to go to England to live. She impressed upon defendant the urgency of her trip and inquired as to her ability to travel.

The drainage from her wound had persisted. Medical testimony indicates that, following a radical mastectomy, intermittent draining will continue for as much as eight weeks, and that it sometimes requires three to four months before the patient is completely well. It should be noted, however, that there existed no apparent infection causing the running of any temperature during defendant's treatment, and on February 14, 1957, the surgeon's notes indicate plaintiff's temperature as normal.

Defendant advised plaintiff that she could travel and, while retaining to himself a personal preference for her to remain in America until attaining full recovery, consented to her plans. She was never advised not to leave.

On March 21, 1957, plaintiff underwent her last examination by defendant, and defendant made the following notation in plaintiff's record:

"March 21, 1957, 'Dressed—She was seen daily in the hospital on the above dates and the wound was dressed as needed. Her knee has improved and she is now up and about. She wishes to return to her home in England to be with her sister. In view of the fact that there is still a slight drainage from the operative wound on the breast the possibility of a foreign body in this wound must be considered and x-rays should be obtained. She states that she feels fine and is perfectly able to travel and she is therefore going to England in spite of the fact that I would prefer that she stay here until she has fully recovered. She will have the ship doctor check her and upon arrival in England will get in touch with a surgeon. An abstract of her record will be forwarded to the doctor there upon receipt of his name and address."

It is at this point that the negligence of the defendant commenced. He revealed none of his suspicions to the plaintiff. He did not order or suggest an X-ray before she left the country—a procedure which would have been relatively simple and inexpensive, and which would have clearly revealed the existence of the surgical sponge as it contained an opaque filament readily observable by the use of X-ray.

As a general proposition, a physician or surgeon may be held guilty of negligence in failing to take an X-ray as an aid in diagnosis or treatment if, under the evidence, it is shown that according to the tenets of the physician's school of medicine, or the usual practice in his locality, the circumstances presented were such as to require the physician, in the exercise of the skill and care with which he was charged, to resort to an X-ray examination. 162 A.L.R. 1295.

The practice of competent surgeons in this community is that, upon suspicion as to the presence of a foreign body, the matter will be explored, X-rays taken if necessary, and the foreign body removed. This practice is clearly established by the testimony of the three experts produced by defendant, particularly Dr. Hoover whose conclusions are accepted by the Court. The fact that defendant knew of plaintiff's intentions to permanently leave the country made it all the more imperative that an X-ray be taken at once. The defendant urges that he was not required to act upon mere suspicion, but his own expert witnesses state to the contrary. Moreover, it is unthinkable that a competent surgeon, having a suspicion as to the existence of a foreign body inadvertently left in the operative wound by him, would permit a·

patient to leave the country without at least advising the patient of his suspicions. The physician owes a duty to his patient to make reasonable disclosure of all significant facts under the circumstances of the then situation. This duty is, however, limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances, and the failure to disclose in all instances does not necessarily suggest a neglect of duty. Mitchell v. Robinson, Mo., 334 S.W.2d 11; Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093; Cf. Vann v. Harden, 187 Va. 555, 47 S.E. 2d 314. It is equally unbelievable that a patient, being advised of the physician's suspicions, would insist upon making the trip to a foreign country without first subjecting herself to an X-ray ordered by the physician.

On March 23, 1957, plaintiff visited defendant's office for the last time. Her bandage was changed and she picked up a letter, written by defendant, addressed to her physician in London, England. While defendant now insists that he was awaiting a request from an English *surgeon* before sending an abstract of her record—the letter being addressed to her *family physician*—the contents of the letter dated March 22, 1957, adequately demonstrate that it was intended to be the abstract. The letter is as follows:

"Dear Dr. Kimerling:

"Mrs. Dietze has requested that I furnish you with an abstract from her recent record. I first saw Mrs. Dietze on January 22, 1957. She was found to have a mass approximately 7 cm. in diameter by 4 cm. in depth in the upper outer quadrant of the right breast. She entered the hospital on the following day, where a frozen section biopsy was done. This biopsy showed carcinoma and a radical resection of the breast was immediately carried out.

"The pathological diagnosis was: Comado-Carcinoma of the Breast with no Metastasis to the Axillary Lymph Nodes.

"Following the surgery, Mrs. Dietze has had persistent drainage which has been quite difficult to clear up. However, the prognosis in her case is very excellent and we do not believe that x-ray treatment is indicated. I would greatly appreciate a note from you in regard to this patient. She is a very delightful person and I do hope that her drainage clears up very rapidly."

From the foregoing it is obvious that defendant was less than candid in revealing all of his suspicions or beliefs as to the cause of the continued drainage.

Defendant now argues that there is no proof of any prolongation, inconvenience or expense which relates to his failure to render proper post-operative treatment in accordance with the principles stated in Vann v. Harden, 187 Va. 555, 47 S.E.2d 314. What has been described as a relatively minor operation in causing the removal of a foreign body, if performed in Norfolk, resulted in pain, infection, fever and discomfort while in Vermont and en route to England. Upon arrival in England on April 9, 1957, she was seen by her physician who, in turn, referred her to a surgeon on April 11. She entered the hospital on April 16 for an operation, and remained there for eleven days. The duration of her convalescence extended over a period of at least six months thereafter.

According to defendant's own statement, she felt "fine" on March 21. The rapidity of her decline thereafter was obviously due to continued infection which could have been arrested promptly, at considerably less expense, had the defendant performed the duty imposed upon him by law. The question of lack of causal connection was raised in Vann v. Harden, supra, and decided against the physician. It is a matter for appropriate determination by the jury or trier of fact.

The damages occasioned subsequent to March 21, 1957, by reason of defendant's

failure to render proper post-operative treatment are as much as, if not greater than, the damages flowing from the act of leaving the sponge in the operative wound. They are the natural and probable consequences of the defendant's dereliction of duty to order X-rays, or further examine plaintiff prior to her leaving this country.

 For the pain, suffering, inconvenience, prolongation or aggravation, and excess hospital, medical and drug expense, the plaintiff will be awarded a judgment in the sum of $6,000, together with her taxable court costs herein expended.

Present judgment order.