Virginia P. HALL, Plaintiff,
v.
Dr. Allen M. FERRY et al., Defendants.
Civ. A. No. 2888.

United States District Court
E. D. Virginia,
at Alexandria.
Nov. 18, 1964.

David L. Carpenter, Arlington, Va., for plaintiff.

E. Waller Dudley, Alexandria, Va., for defendant.

LEWIS, District Judge.

This is an action for malpractice. The plaintiff claims her present condition is the direct or a contributing result of the failure of the defendant doctors and hospital to exercise a reasonable amount of ordinary care, skill and diligence in the diagnosis, care and treatment rendered during her stay in the National Orthopaedic and Rehabilitation Hospital.

The evidence discloses the plaintiff first went to see Dr. Werner Prinz, a general practitioner, July 29, 1961. She then complained about soreness and pain which was localized in her left hip and thigh, also in her lower back. The pain radiated down to her knee. She returned to the doctor's office the following Monday. Her condition remained the same. Neurological findings were normal. Severe pain localized in the hip and pain in the thigh. The pain complained of occurred rather suddenly (about July 25th or 26th). It was a continuous pain. Her condition was then very cloudy. Dr. Prinz did not know what it was. He referred her to the Anderson Clinic. She went there August 1, 1961, and was initially seen by Dr. Allen Ferry. She complained of pain in her left hip. The history then taken by Dr. Ferry disclosed no injury that might have brought on plaintiff's present condition. Her trouble started in the left hip and radiated into the left thigh, down into the shin and ankle—sometimes the inner side of the thigh and sometimes the outer side—and the distribution down the leg was rather irregular. She had no weakness, numbness or tingling in the extremity. She had no significant amount of backache although she states in the past she has had occasional backaches. No previous attacks of this sort. Examination revealed lumbosacral tenderness. Straight leg raising was negative. Motions of the hip did not appear to be very painful. X-rays revealed increased lumbosacral angle, but no pathological changes in the bones or joints of the lower back, pelvis or hip were noted.

Dr. Ferry diagnosed the plaintiff's then conditioned as disc syndrome with left sciatica and recommended that she be admitted to the hospital for traction, bed rest, physiotherapy, and so forth. The doctor noted on his report dated August 2, 1961, "The picture is a rather bizarre one and continued observation for possible other diagnosis must be ruled out."

The plaintiff was admitted to the National Orthopaedic and Rehabilitation Hospital under the care of Dr. Ferry August 1, 1961. Dr. Shafoot Ahmed, the resident physician, on the morning of August 3rd examined the plaintiff and took a more detailed history of the case. Her then chief complaint was pain in the left side low back going in left lower limb. She developed low backache for the first time about a week ago. Gradually it started getting worse. The onset was not related to any injury definitely. Three days after onset it was severe enough to compel her to seek doctor's help. She was under treatment of family doctor for four days. Little relief. Actually the symptoms got worse. Yesterday X-rays were taken. Her family doctor referred her to Dr. Ferry. No numbness or tingling. No foot drop. A year ago she once slipped, sprained her ankle and slightly twisted her back which was slightly sore for awhile. Among other things she had had were measles, mumps, whooping cough, chickenpox, appendectomy and total hysterectomy, removal of female organs.

Dr. Ahmed's physical findings were generally normal. Neurological examination was essentially negative. Tenderness was found in LT lower back. Most marked in L–S region and sciatica notch region. Patient complained of having shooting pain in left thigh. Sensations

are normal. Planter area flexor both sides. DTR exaggerated (specially knee joint left side). Impression, disc syndrome L5–S1 region Pon LT sciatica.

The hospital records (nurses' notes) [1] disclose the plaintiff complained of severe low back pain, shooting and pounding pain in both legs, left knee and ankle; tenderness in right and left thigh; large red area on left buttock and on left thigh. The doctors' orders [2] disclose treatment and medication prescribed. [3] The progress notes [4] record the improvements in the plaintiff's condition during her stay in the National Orthopaedic Hospital.

Dr. Ferry was not completely satisfied with his initial diagnosis of disc syndrome. He consulted a neurosurgeon because of the continued pain going all the way down the extremity to the ankle. The consultant, Dr. Bucur, examined the plaintiff and reviewed the X-rays on August 12th. He concluded the plaintiff might have a thrombophlebitis though without typical pain distribution or findings, polyneuritis or gouty arthritis. He found no nerve root compression.

Dr. Masterson first saw the plaintiff on August 14th. She then had complaints of pain in the leg but only when it was moved. A small tender area was noted in the interior portion of the right thigh. Palpation of the low back showed definite spasm to be present. Tenderness was present along the sciatic root on the left. No tenderness was noted in the calf of the leg and dorsiflexion of the foot showed no evidence of so-called positive Homan's sign for phlebitis. Dr. Masterson thought that the admitting diagnosis of probable sciatica was correct but that the possibility of a true gouty arthritis and a low steroid osteoporosis, on the basis of the uric acid studies and the removal of all female organs, should be entertained. The patient was then started on Dr. Masterson's gout routine. Her temperature remained essentially level.

On August 18th a large reddened area was noted on the left buttock which was felt to be due to an irritation from injections she received. On the following day another reddened area appeared on the right buttock and pain on examination on that date showed it was mostly in front of the leg radiating down on the left side to the toes.

Over the 21st, 22nd and 23rd of August the plaintiff was gradually ambulated. She was able to do back exercises designed to increase her abdominal muscle tone. She was able to walk on crutches on the 23rd with light weight being placed on the left leg. No special complaints were noted on either August 28th or 29th and she was allowed to go home on the 29th, ambulatory, taking light weight on the affected left leg, with the probable final diagnosis in Dr. Masterson's opinion of probable disc lesion with left sciatic complicated by chronic otitis media.

The plaintiff was readmitted to the National Orthopaedic and Rehabilitation Hospital on September 2, 1961, at 2:50 a. m., with a fractured left femur, upper shaft. She was X-rayed and the left femur and hip placed in a Thomas splint. She was then transferred, at her request, by ambulance to the George Washington University Hospital. No further history or physical examination was made at the National Orthopaedic and Rehabilitation Hospital.

The records of the George Washington University Hospital (September 2, 1961) disclose that the plaintiff there gave a history of pain in her left thigh for six weeks, made worse on standing; that she was initially put in a hospital elsewhere in hip traction from August 1st to the 13th, 1961, and told she had a pinched nerve; that she was taken off traction on August 13th and told there was a thrombophlebitis by another consultant and put on anticoagulants. She was walking upstairs Tuesday, and after standing for a few minutes her leg gave way, followed by pain and swelling.

1. See Appendix A.
2. See Appendix B.
3. See Appendix C.
4. See Appendix D.

Impression, pathological fracture of the left femur.

Dr. Keck, the then attending physician at George Washington Hospital, noted on September 3rd: The old X-rays reveal transverse fracture at junction upper and middle third of left femur. Bone at fracture site appears rat eaten (osteolytic). General physical negative for obvious tumor. On September 5th he consulted an expert re possible primary cause for pathological fracture of plaintiff's left femur. Impression, primary site not obvious. May be lung, kidney or pancreas, or lymphoma. The consultant recommended a biopsy of the lesion in the femur; further steps depend on this.

She was operated on September 8, 1961. It was then determined for the first time that the plaintiff had acute hematogenous osteomyelitis. This disease is rarely found in the femur of a female of the plaintiff's age.

The plaintiff, in relating the events leading up to her present condition, says she first noticed intense pain in her leg just a couple of weeks before she went to see Dr. Prinz. The pain was deep inside her leg, about the middle of the femur, and ran down her knee. It would work up into the hip joint. Dr. Prinz treated her over the week end and then recommended that she go to the Anderson Clinic for a more specialized examination. She went there the following Tuesday and told them where her leg was hurting and wanted to get an X-ray of that area. They took a pelvic X-ray and showed it to her, and said it indicated a pinched nerve in her leg. She then went upstairs and saw Dr. Ferry. He examined her for about two minutes and admitted her to the National Orthopaedic Hospital for traction. She claims Dr. Ferry did not take a history or make any examination of her back. She asked him why he did not take an X-ray of her leg when she came in with an ache in her leg and that he just told her all leg pains stemmed from the back.

The plaintiff further claims that Dr. Ahmed never took a medical history from her and never gave her a physical examination at any time while she was in the National Orthopaedic Hospital. Her leg was off-color, pinkish- or purplish-looking, when she first went to see Dr. Prinz and it was like that when she first saw Dr. Ferry. She kept telling Dr. Ferry that her pain was between her knee and thigh and requesting that he take an X-ray of her leg. She had no back pain prior to being placed in traction.

Dr. Masterson took over after Dr. Ferry went on his vacation. She told him all about the pain in her leg. He examined her on several occasions but never told her what was wrong with her. She was never told that she had gout.

Her leg was noticeably reddened and swollen when she entered the National Orthopaedic Hospital and remained in that condition throughout her stay. She admitted there were areas of redness on her buttocks where the needles were injected. She still had one area of redness on her left hip when she left the hospital.

The plaintiff was discharged from the National Orthopaedic Hospital on the 29th of August and had hopes of going back to work the following Monday. After watching the late show on September 2nd, she went upstairs with the aid of crutches and walked over to her dresser when all of a sudden her leg "popped like a gun going off." She was then taken to the National Orthopaedic Hospital, readmitted, X-rayed, and given temporary medication. She became dissatisfied with the treatment she was then receiving at the National Orthopaedic Hospital and was, at her request, transferred to the George Washington University Hospital by ambulance.

She described in considerable detail the extent of her injuries and claimed special damages totaling $35,708.54.[5]

5. This amount included hospital, ambulances, nurses, prescriptions, braces, and doctor bills; loss of income and expenses incurred for care of infant child.

Three expert witnesses were called—one by the plaintiff; two by the defendants.

Dr. Charles Keck, the orthopedic surgeon who operated on the plaintiff, stated the diagnosis and treatment rendered the plaintiff were proper except for the failure of the attending physicians, Drs. Ferry and Masterson, to take an X-ray of the plaintiff's femur on or about August 18th. Such an X-ray at that time, in Dr. Keck's opinion, would have indicated the necessity of aspirating the reddened area or warranting an exploratory operation. Had the X-ray then been taken and followed up, the osteomyelitis later found in the plaintiff's femur would have been then discovered. It would not have altered the chronic drainage and cleared up the infection but would have averted the subsequent fracture of the femur. Dr. Keck conceded that the taking of an X-ray is generally left to the discretion of the examining doctors.

Dr. William Deyerle, an orthopedic surgeon from Richmond, Virginia, was of the opinion that the attending physicians, Drs. Ferry and Masterson, did not depart from the usual standards of medical practice in diagnosing the plaintiff's ailment. He would not have taken an X-ray of the lower two-thirds of the plaintiff's femur and did not think the average orthopedic surgeon in this community would have so done after having taken an X-ray of the upper third of her femur.

Dr. Robert W. Lee, an orthopedic surgeon with a personal long-standing history of osteomyelitis, was of the opinion that the attending physicians made the diagnosis of the plaintiff which the average prudent doctor in this area would have made under similar circumstances. He would not have taken an X-ray of the plaintiff's femur in this case and did not believe that the average doctor would have so done.

The plaintiff couches her complaint in six counts.

Count I charges Dr. Ferry, individually and as agent of the hospital, with failing to exercise a reasonable amount of ordinary care, skill and diligence in the diagnosis, care and treatment rendered during her stay in the National Orthopaedic and Rehabilitation Hospital.

Count II charges Dr. Ferry, individually and as agent of the defendant hospital, with failing to take a medical history and to perform a thorough and complete physical examination of the plaintiff upon her admission to the hospital, and in failing to evaluate such medical information and in failing to use such familiar diagnostic aids as X-ray photographs.

Count III charges Dr. Ferry, individually and as agent of the defendant hospital, with failing to properly follow and know the plaintiff's condition and complaints, and to regularly perform physical examinations and take X-rays of her during the first thirteen days of August, 1961.

Count IV charges Dr. Masterson, individually and as agent of the defendant hospital, with failing to properly follow and know the plaintiff's condition and complaints, and to regularly perform physical examinations and take X-rays of her from August 14th to August 29th, inclusive.

Count V charges Drs. Ferry and Masterson, individually and as agents of the defendant hospital, with failing to afford the plaintiff all the standard and customary diagnostic aids then available, and to perform upon her proper medical examinations and tests prior to discharge from the hospital.

Count VI charges the defendant doctors, individually and as agents of the hospital, with unnecessary delay in readmitting the plaintiff to the hospital on September 2nd, and charges Drs. Ferry and Masterson with failing to render her immediate care and treatment commensurate with her known past history.

Count VII alleges the plaintiff was suffering from acute osteomyelitis during all the time she was in the National Orthopaedic and Rehabilitation Hospital and the diagnosis made by Drs. Ferry and Masterson was grossly incorrect and

lacking in scientific basis, all of which directly caused or contributed to the permanent injuries suffered by the plaintiff.

The burden is on the plaintiff to prove her charges by a preponderance of the evidence.

She has failed to so do in re the defendant hospital and her counsel so conceded during final argument. The National Orthopaedic and Rehabilitation Hospital, Inc. was then dismissed as a party defendant.

Plaintiff has likewise failed to prove that Dr. Ferry failed to take her medical history and to perform a thorough and complete physical examination upon her admission to the hospital. The hospital records completely refute this charge, albeit the statement of the plaintiff that Dr. Ferry saw her for about two minutes and that Dr. Ahmed never took her history or gave her a physical examination. These records disclose that Dr. Ferry took a history, X-rayed and examined the plaintiff on August 1st. Dr. Ahmed, the resident physician, took a more detailed history and made a more extensive physical examination on August 3rd. His report was noted by Dr. Ferry on the same date.

These same hospital records, coupled with the testimony of the independent doctors who examined them, and particularly the testimony of Dr. Keck, completely refute the plaintiff's charge that Drs. Ferry and Masterson failed to properly follow and know her condition and complaints during her stay in the National Orthopaedic and Rehabilitation Hospital. The doctors there saw her daily. Various and sundry medications and aids were prescribed. Numerous laboratory tests were made.[6] Pelvic (low back) and chest X-rays were taken. A neurologist and ear specialist were called in. The nurses' notes were copious. The plaintiff's progress was periodically noted and recorded.

Dr. Keck, the plaintiff's principal medical witness, found no fault with the care and treatment of the plaintiff during her stay in the National Orthopaedic Hospital, with the exception of the failure of the attending physicians to X-ray her left femur some time between August 11th and 18th.

There was a notable paucity of evidence supporting the plaintiff's charge that she was discharged from the National Orthopaedic and Rehabilitation Hospital absent proper medical tests and examinations, and that Drs. Ferry and Masterson were responsible for the unnecessary delay in readmitting her to that hospital on September 2nd and in failing to render her immediate care and treatment commensurate with her known past history. The hospital records disclose that the plaintiff slept well and had few complaints during her last week in the hospital—she went home ambulatory on the 29th of August with the expectation of returning to work following Labor Day. She selected Dr. Keck via the telephone from her hospital room on September 2nd upon the recommendation of a friend. The doctor agreed to treat her then broken leg providing she transfer to the George Washington University Hospital. She so requested, and was there sent by ambulance. Dr. Rook, one of the defendant doctors, first X-rayed her broken femur, administered medications to reduce her pain, and placed her in a Thomas splint in order to make the ride to the hospital as comfortable as possible.

The balance of the plaintiff's complaint centers on the alleged failure of the defendant doctors to use that degree of care, required by law, in diagnosing her ailment.

The Supreme Court of Appeals of Virginia has stated and restated the applicable law:

"* * * A physician holds himself out as possessing the knowledge and ability necessary to the effective practice of medicine. He impliedly represents that he is keeping abreast of the literature and that he has

6. Urinalysis, Routine Hematology, Serology I, Blood Chemistry I, Special Hematology II, and Bacteriology II.

adopted those techniques which have become standard in his line of practice. However, he is not an insurer, nor is he held to the highest degree of care known to his profession. The mere fact that he has failed to effect a cure or that his treatment has been deleterious will not raise a presumption of his negligence. He must exhibit only that degree of skill and diligence employed by the ordinary, prudent practitioner in his field and community, or in similar communities, at the time." Reed v. Church, 175 Va. 284, 8 S.E.2d 285; Alexander v. Hill, 174 Va. 248, 6 S.E.2d 661; United Dentists v. Bryan, 158 Va. 880, 164 S.E. 554; Ropp v. Stevens, 155 Va. 304, 154 S.E. 553; Hunter v. Burroughs, 123 Va. 113, 96 S.E. 360; Fox v. Mason, 139 Va. 667, 124 S.E. 405.

Gauging the evidence as here presented by these standards, the Court finds that Dr. Ferry first noted this case as a rather bizarre one. He ordered continued observation for possible other diagnosis. His original impression was probable disc syndrome with left sciatica. Dr. Ahmed, the resident physician at the National Orthopaedic Hospital (he was not connected with Drs. Ferry or Masterson), and all other physicians including Dr. Keck, concurred in Dr. Ferry's original preliminary diagnosis.

· Dr. Ferry thought of possible thrombophlebitis on August 10th and asked Dr. Bucur, a well known neurosurgeon, to see if the plaintiff's pain pattern suggested anything to him. Dr. Bucur, upon reviewing the X-rays taken August 1st and upon examination of the hospital records and the plaintiff, suggested she might have thrombophlebitis, polyneuritis or gouty arthritis.

Dr. Masterson, while admitting Dr. Ferry's original diagnosis was correct, examined the possibility of a true gouty arthritis and a low steroid osteoporosis on the basis of the uric acid studies. He later suspected a possible virus pneumonia and ordered chest X-rays.

Neither Dr. Ferry nor Dr. Masterson diagnosed the plaintiff's ailment as osteomyelitis of the left femur. They did not X-ray her left femur between the 11th and 18th of August—there was insufficient evidence of injury in this location to so justify.

Dr. Keck, upon reviewing the case, says he would have been suspicious of such an infectious disease some time between August 11th and the 18th when a red spot was first noticed on the plaintiff's thigh. He would at that time have X-rayed her left femur. This X-ray (he says) would have indicated destruction in the bone at that point only—this destruction could have been caused by a number of things—subsequent operation or aspiration would have proven the suspected diagnosis.

Dr. Keck never diagnosed the plaintiff's ailment as osteomyelitis of the left femur until after he operated September 8th. He first suspected a tumor and consulted an expert re the possible primary cause of her pathological fracture. He had the September 2nd X-rays of the plaintiff's femur when he first saw her upon entry to the George Washington Hospital.

"As a general proposition, a physician or surgeon may be held guilty of negligence in failing to take an X-ray as an aid in diagnosis or treatment if, under the evidence, it is shown that according to the tenets of the physician's school of medicine, or the usual practice in his locality, the circumstances presented were such as to require the physician, in the exercise of the skill and care with which he was charged, to resort to an X-ray examination." See 162 A.L.R. 1295; Dietze v. King, D.C., 184 F.Supp. 944.

Here one medical expert (Dr. Keck) says the defendant doctors should have taken an X-ray of the plaintiff's femur between August 11th and 18th. Two equally expert medical witnesses (Drs. Deyerle and Lee) say the average orthopedic surgeon practicing in this commun-

ity would not have taken such an X-ray at that time.

Dr. Keck predicated the taking of this X-ray on the assumption of a reddened area on the plaintiff's thigh—her elevated temperature (102°)—localized pain—white count. Such an assumption is not fully corroborated by the record. The reddened area was noted as being on both buttocks and thigh and being caused by needles. Drs. Deyerle and Lee did not think the plaintiff's elevated temperature or white count indicated possible osteomyelitis. Neither of these doctors would have X-rayed the plaintiff's left femur between August 11th and 18th. Dr. Deyerle would not have done so after having taken an X-ray of the upper third of the plaintiff's femur (X-ray of August 1st). Dr. Lee would not have taken the X-ray because he would not have known where to take it.

There is no standard or usual practice followed by doctors in this community re the taking of an X-ray as an aid in diagnosis or treatment. It is left to the discretion of the examining doctor. Dr. Keck, the plaintiff's principal medical expert, so testified.

" * * * negligent practice of a physician in the diagnosis of a patient can be established only by expert testimony, and if the proof leaves it equally probable that a bad result may have been due to a cause for which the defendant was not responsible as to a cause for which he was responsible, the plaintiff cannot recover." Dietze v. King, supra, and cases cited.[7]

█ Acute hematogenous osteomyelitis is rarely found in the femur of adult females. The plaintiff has failed to prove the negligent practice of the defendant doctors in diagnosing her ailment, and her suit will be dismissed.

Counsel for the defendants should prepare an appropriate order in accordance with this memorandum opinion, submit it to counsel for the plaintiff for approval as to form, and present it to the Court for entry.

## APPENDIX A

### National Orthopaedic and Rehabilitation Hospital Records

#### (Nurses' Notes)

| | |
|---|---|
| August 1st and 2nd | Severe low back pain. |
| August 3rd and 4th | Shooting pains down left leg. |
| August 5th | Pain in upper left leg. |
| August 6th | Pounding pain in left leg. |
| August 7th | Shooting pain in left leg. |
| August 8th | Severe pain, left upper leg. |
| August 9th | Back pain with pain in upper left leg. |
| August 10th | Severe pain in right leg, left thigh and lower leg, knee and ankle. |
| August 11th | Pain in lower left leg with pain in ankle, knee and thigh. |

7. Reed v. Church, 175 Va. 284, 8 S.E. 2d 285; Hunter v. Burroughs, 123 Va. 113, 96 S.E. 360; Fox v. Mason, 139 Va. 667, 124 S.E. 405; Alexander v. Hill, 174 Va. 248, 6 S.E.2d 661.

APPENDIX A—Continued

| August 12th | Stabbing pain in left leg. |
|---|---|
| August 13th | Further pain in leg and complaints of headache and feet being cold. |
| August 14th | Rising temperature, with complaint of small tender area on anterior posterior of right thigh. |
| August 15th | Pain in leg at outer knee and in left groin. |
| August 16th | Tenderness in left groin and in left thigh. |
| August 17th | Pain in left leg together with complaints of pain all over. |
| August 18th | Comfortable night; apparently slept all night; large red area on left buttock. Dr. Sukar notified. Dr. Ahmed looked at the reddened area on the left thigh. |
| August 19th | Complains of pain in left hip and leg. Slept well most of night. Compresses to left buttock. Complaints of pain along left front of leg down to toes. Up in wheelchair. |
| August 20th | Complains of throbbing pain in left lower leg. |
| August 21st | Apparently slept well; no complaints of pain. |
| August 22nd | Minor complaints of pain in lower leg. Slept well all night. |
| August 23rd | Slept well. Left ear examined by Dr. Sukar. |
| August 24th | Complained of pain in leg and ear; quiet evening. |
| August 25th and 26th | Up in wheelchair; no complaints. |
| August 27th | Apparently slept well. Patient says leg still feels sore below knee on lateral side of left leg. |
| August 28th | No complaints; apparently slept well. |
| August 29th | Apparently slept soundly; discharged per wheelchair. |

APPENDIX B

National Orthopaedic and Rehabilitation Hospital Records

(Doctors' Orders)

| August 1st | Low back case; routine orders. s/Ferry |
|---|---|
| August 4th | Hot pack to left knee. s/Ferry |
| August 7th | Hot packs to left upper leg; blood uric acid. s/Ferry |
| August 8th | Cinbisal for gout. Low purine diet. s/Ferry |
| August 9th | Sed rate and urinalysis. s/Ferry |

APPENDIX B—Continued

| | |
|---|---|
| August 11th | Ask Dr. Swain or Dr. Bucur to see if they have any diagnostic gems to suggest. Ask Dr. Masterson to follow while I am away. s/Ferry |
| August 12th | Discontinue traction. Wrap left lower extremity with Ace bandage from foot to groin. |
| August 13th | Reduce cinbisal. s/Kaye |
| August 14th | Discontinue cinbisal. s/Masterson |
| August 15th | Chest X-ray. |
| August 17th | Discontinue acromyacin. s/Masterson |
| August 18th | Warm compresses to left buttock. s/Sukar<br>Discontinue priscoline. s/Masterson<br>Watch size and nature of patch of redness in left upper thigh. s/Ahmed |
| August 19th | Hydroculator packs to both buttocks over reddened area. s/Masterson |
| August 21st | Exercise No. 2 and No. 3 and abdominal tightening exercise. s/Masterson |
| August 22nd | Discontinue acromyacin after today. Discontinue wrapping left leg. s/Masterson |
| August 23rd | Walked with crutches. Protected weight on left leg. s/Masterson |
| August 24th | Change ear plug. s/Linden |
| August 27th | May have second polio injection. |
| August 29th | Discharge today. Return in three weeks to see Dr. Masterson.<br>s/Masterson |

## APPENDIX C

National Orthopaedic and Rehabilitation Hospital Records

(Medication Prescribed)

Equanil

Nembutal

Butazolidin

Demerol

Cinbisal

Acromyacin

Thorazine

Priscoline

Hlophen

Colchicine

Deladumone

Neosynephrine

Nasone

Polio Vaccine

## APPENDIX D

### National Orthopaedic and Rehabilitation Hospital Records

#### (Progress Notes)

| | |
|---|---|
| August 4th | Pain is diminishing.  s/Ahmed |
| August 5th | Doing much better.  Pain is much less.  s/Ahmed |
| August 6th | Condition generally improved.  s/Ahmed |
| August 7th | Still complains of pains but pains have diminished since yesterday.  No significant change in condition.  s/Ahmed . |
| August 9th | Uric acid is elevated.  Having back pain again. Yesterday she was much better.  s/Ahmed |
| August 10th | Temperature elevated to 100°.  Pain in calf and groin but no swelling and Homan's negative. Thrombophlebitis.  Pain still scattered, variable and equivocal. Will repeat CBC and sed rate. s/Ferry |
| August 11th | Still complains of much pain in groin, front of thigh, back of thigh, front of knee, front of lower leg.  No significant back pain.  No significant calf tenderness.  Equivocal tenderness over femoral vessels.  Sed rate still up.  WBC up some.  Temperature slightly elevated.  Ask Dr. Swain or Bucur to see if this pain pattern suggests anything to them.  Still don't see much evidence of phlebitis.  s/Ferry |
| August 18th | Patient seems much more comfortable.  She is up and around in wheelchair and has not complained of pain.  s/Ahmed |
| | Patient developing patchy erythema size 3½" x 3" on post lateral aspect of left upper thigh. It is tender and hot.  Slight induration also felt.  It is either cellulitis/localized thrombophlebitis.  Patient is already on acromyacin which will be continued and this patient watched.  s/Ahmed |
| August 21st | Lab findings were noted.  Pro. activity had coursed down from 80% to 70%.  A persistent leuckytosis with a shift to left noted.  Otherwise she seems much better and has no particular complaints.  s/Ahmed |
| August 26th | Dr. Linden's notes pertaining to ear difficult to read. |
| August 29th | Discharge note: Patient's condition is improved. Is tolerating increased activities well.  s/Ahmed |

No progress notes were made on the dates not listed.