**Eliza K. MORGAN, Appellant,**

v.

**Maurice R. SCHLANGER and Lemuel E. Mayo, Appellees.**

**No. 10770.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 13, 1967.

Decided Feb. 27, 1967.

Edward R. Baird, Norfolk, Va. (Baird, Crenshaw & Ware, Norfolk, Va., on brief), for appellant.

Allan S. Reynolds, Norfolk, Va. (White, Ryan & Reynolds, Norfolk, Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BELL and WINTER, Circuit Judges.

WINTER, Circuit Judge.

Plaintiff's suit for malpractice was dismissed at the close of her case for lack of medical testimony to support her alleged cause of action. On motion for summary judgment and by pretrial order limiting the issues, before trial, a plea of limitations was sustained as to a major part of her alleged cause of action. She appeals from both rulings. Under the law of Virginia, which we must apply in this diversity action, we think that the rulings of the district judge were correct, and we affirm.

The proof adduced by the plaintiff showed the following: Sometime in 1937, plaintiff underwent a partial hysterectomy. On August 27, 1962, she had occasion to consult Dr. Maurice R. Schlanger for a rapidly beating heart. Dr. Schlanger, as a result of a routine Pap smear, obtained a positive reaction to possible malignancy in her female organs. He immediately had her admitted to the hospital and referred her to

Dr. Lemuel E. Mayo, a surgeon, who, three days later, performed a conization of the cervix on her. The sample of tissue so obtained was found to indicate that she was suffering from cancer of the cervix. Drs. Schlanger and Mayo decided not to treat her surgically but to administer internal radium and external x-ray treatments. The irradiation treatments began promptly and were concluded two months later, in November, 1962.

By December, 1962, Mrs. Morgan began to experience severe pains in her lower abdomen and a foul purulent vaginal discharge. Throughout the rest of the winter and the following spring her condition continued to deteriorate and she continued to consult with Drs. Schlanger and Mayo. Dr. Mayo assured her that she was "doing fine" but she was experiencing chills at night, fever during the day, and thought she was getting worse. She was hospitalized from March 16, 1963 until April 6, 1963 under the care of these doctors. Not until March 17, during this first post-radiation hospitalization, did she learn, as a result of her direct inquiry to Dr. Mayo, that she was suffering from radiation burns. She returned to the hospital April 23 and was discharged approximately May 5. Her final hospitalization under the care of Drs. Schlanger and Mayo began May 19 or 20, 1963 and continued until June 16, 1963.

During her third and last hospitalization, Mrs. Morgan was given a blood transfusion and intravenous glucose feedings. Toward the end of her stay, both doctors told her that she could go home and would not need a colostomy in order to recover. Mr. Morgan testified that on June 13, he, too, had a conversation with Dr. Mayo, who told Mr. Morgan that both Dr. Schlanger and Dr. Mayo had decided that Mrs. Morgan would not require a colostomy, that she could go home and live without it. He was told that he had nothing to worry about and that, in the opinion of the doctors, "she's over the hump." [1]

On June 16, 1963, the day that Mrs. Morgan was discharged from the hospital, she was still suffering from all of her previous symptoms, including rectal bleeding. As she was rolled out in a wheel chair, she vomited going down the hall to the door. The doctors did not indicate the necessity of further visits or examinations and they gave her a prescription for a bottle of pills for pain " * * * which was everything I was given or anything that I was told." [2]

When Mrs. Morgan arrived at her home she ascertained her temperature to be 99°. She was in acute distress and was immediately put to bed. She felt worse, weighed less and was weaker than she had been in March, when she had first gone to the hospital after the radiation treatments. Her symptoms had also intensified.

After being home several days, plaintiff acceded to the urgings of her husband, family and neighbors that she seek other medical treatment. Six days after her return home she was taken by ambulance to another hospital and admitted. In the ambulance, she lay down, because, according to her testimony, "I hadn't been able to sit down in a chair for some time." In that hospital she came under the care of Dr. Charles H. Peete, Jr., an obstetrician and gynecologist, and Dr. William P. J. Peete, a surgeon. After examination and tests, Dr. Peete concluded to perform a colostomy, and the operation took place on June 28, 1963, less than a week later.

Dr. Charles H. Peete, Jr., as a result of his examination, found principally proctitis and periproctitis, a type of inflammation involving the large and small

---

1. The hospital records showed an entry of Dr. Mayo, as a result of a rectal examination on June 10, 1963, " * * * I believe this lady will eventually need a colostomy if not at present." Dr. Schlanger's June 16, 1963 discharge note read: "Pt. has been explained that a colostomy could be done to relieve her intestinal disorders. We prefer, however, to let time heal her radiation complications if it will. Pt. will be kept under observation."

2. See, however, hospital note quoted in fn. 1.

bowel, with swelling and tenderness. This was the result of infection in and around the lower bowel, with swelling, a lot of scar tissue and inflammation. He and Dr. William P. J. Peete, at first, thought this was a result of an active malignancy. Such was not the case however, and Dr. Charles H. Peete, Jr. "presumed" that the intestine was affected by radiation. In response to more specific questioning, he said that the intestine was infected from the tumor, or treatment of the tumor, or a combination of the two conditions.[3] Dr. William P. J. Peete, in his testimony, characterized plaintiff's operation as not "an emergency." She has made a good recovery from the operation, although her colostomy is probably permanent.

■ Plaintiff's suit was filed *March 12, 1965*.[4] This date was more than two years after the radiation treatments were concluded (November, 1962) but within two years after the termination of her third post-radiation hospitalization (June 16, 1963).

We must decide two questions. The first is, assuming malpractice either in the decision to use, or in the administration of radiation, in the period September to November, 1962, whether plaintiff may sue on March 12, 1965, unhindered by a plea of limitations, when she did not learn of any malpractice until March 17, 1963 at a time when she was under continuing treatment by the physicians guilty of malpractice, the purpose of which was to correct the medical problems that the malpractice caused. Next we must consider, even if the first question is answered in the negative, whether plaintiff presented sufficient proof, in the absence of direct expert medical testimony to that effect, that her hospital discharge on June 16, 1963 and the failure to advise her of the necessity of a colostomy, or to perform it on her, prior to that date constituted malpractice. These questions we must answer not by our own views of what the law is, or what the law should be, but what we perceive the courts of Virginia have said

3. "Q. * * * Did the infection of the intestine derive from the radiation treatment?
A. Uh, Mr. Baird, I don't know whether I could answer that directly or not. I know that patients do get infection on the basis of irradiation. We know that many of them have infection present when we first see them untreated, and whether or not the infection pre-existed the treatment, I was in no position to determine. In our own experiences we found some 2 to 3 per cent of persons who do get proctitis and periproctitis following treatment for their cancers.
Q. Doctor, I am not sure I understood your answer. Would you please repeat it?
A. In some 2 to 3 per cent of patients treated for cancers, there will be complicating proctitis and periproctitis in our own clinic here. This is based on a study made some ten years ago."
* * * * *
"Q. All right, sir, now you mentioned the 2 or 3 per cent of the patients who received irradiation therapy developed complications similar to what Mrs. Morgan had. Is that correct?
A. This is a study that was done in our institution that so indicates that this is true.

Q. Is there any way that one can predict whether a particular patient is in this 2 or 3 per cent category prior to the treatment?
A. Not to my knowledge, no. There is no way to indicate sensitivity of the tumor, nor possible risk to the patient of treatment.
Q. And isn't this true without regard to the severity of the condition or the degree of advancement of the carcinoma?
A. In general, yes. There may be exceptions that the more advanced tumors tend to have more complications earlier, but the sensitivity is present regardless of the stage of disease."

4. As initially instituted, the hospital at which radiation was given and two staff doctors who administered radiation were joined as parties defendant, in addition to appellees. Subsequently, plaintiff consented to a dismissal of the suit against the hospital on the ground of charitable immunity. The suit was dismissed against the staff doctors because of limitations. Plaintiff does not appeal as to them, apparently because they rendered no treatment to her after November, 1962, and her failure to discover any malpractice until March, 1963 would not toll the statute. Hawks v. DeHart, 206 Va. 810, 146 S.E. 2d 187 (1966), discussed more fully infra.

the law of Viginia is, or, to the extent the precise question has not been decided by the Viginia courts, what the law of Virginia would be.

## Limitations

■ Virginia has a two year statute of limitations in actions *ex delicto*. Code of Virginia (1950 Ed) § 8–24. Virginia also is "committed * * * to the rule that in personal injury actions the limitation on the right to sue begins to run when the wrong is done and not when the plaintiff discovers that he has been damaged," even in malpractice cases. Hawks v. DeHart, 206 Va. 810, 146 S.E.2d 187, at 189 (1966).

The general problem of limitations in malpractice cases was thoroughly reviewed in the recent Maryland decision of Waldman v. Rohrbaugh, 241 Md. 137, 215 A.2d 825 (1966). There, Chief Judge Hammond, writing for the Court, acknowledged that the general and older rule in malpractice cases is that limitations begin to run from the date of the alleged wrong and not from the time that the wrong is discovered by the patient. That strict application of this rule leads to a shockingly harsh result, particularly where the advice given the patient is the claimed malpractice or where the patient is unqualified to ascertain the imperfection, was recognized. Judge Hammond pointed out that, in addition to fraudulent concealment of facts constituting negligence,[5] courts in many jurisdictions have sought to mitigate this unenlightened standard by saying, in appropriate cases, that limitations begin to run from the time the patient first knows, or should have known, of the malpractice (the "discovery rule"), or that if treatment by the doctor is a continuing course, limitations do not begin to run until treatment by the medical man for the particular disease or condition involved has terminated (the "continuing treatment rule"), unless, of course, during the course of treatment the patient learns, or should reasonably have learned, of the harm, in which event limitations begin from the time of actual or constructive knowledge. Judge Hammond stated that, "[S]ince about 1940 there has been a slow but steady trend towards judicial acceptance of the continuing treatment rule" (215 A.2d at p. 828), and collected the cases from courts which indicate liberality in this regard. To his collection, we would add Johnson v. St. Patrick's Hospital, Mont., 417 P.2d 469 (1966).

■ Judge Hammond also pointed out that recently West Virginia, another state in this Circuit, in Morgan v. Grace Hospital, Inc., W.Va., 144 S.E.2d 156 (1965), had expressly overruled two of its earlier decisions and had adopted the discovery rule in the malpractice case there considered, recognizing also that in an appropriate case the continuing treatment rule is proper. We have no difficulty in concluding that the "continuing treatment" rule is the fairer rule, but we must determine whether it is the rule in Virginia.

The Supreme Court of Appeals of Virginia has not directly decided whether the continuing treatment rule is the law of Virginia. In Hawks v. DeHart, supra, it has decided, in spite of substantial modern authority to the contrary,[6] that the discovery rule is not part of the law of Virginia. In so doing, it has, to our minds, made clear Virginia's unwillingness to permit any exception to the general rule that in personal injury actions limitations on the right to sue begin to run when the wrong is done and not when the plaintiff discovers that he has been damaged, absent a showing of fraudulent concealment. In the *Hawks* case a surgical needle was left in the

5. By Virginia statute, limitations do not run against persons who "by any * * * indirect way or means obstruct the prosecution" of the claim to be asserted. Code of Virginia (1950 Ed.) § 8–33. Plaintiff makes no contention that this statute is applicable to this case.

6. See authorities collected in Waldman v. Rohrbaugh, supra, 215 A.2d at p. 830. See also, Prosser, Torts, 3d Ed. (1964), § 30, pp. 146–148.

plaintiff's neck in the course of a goiter operation performed in 1946. The plaintiff complained of difficulties with her neck over a period of years, but she did not discover that her difficulties could be ascribed to the needle until 1962. Within two years after such discovery she sued, but her claim was held barred by limitations. The court stated Virginia's general rule that limitations begin at the time the wrong is committed, even though the person wronged is not immediately aware that he was hurt, and added this significant comment:

> "There are cases to the contrary, fixing the discovery of damage *or other events as the time when the limitation begins,* e. g., Morgan v. Grace Hospital, Inc. (W.Va.), 144 S.E. 2d 156; but as said by Louisell and Williams in 'Medical Malpractice,' § 13.06, at p. 369:
>
> > 'By far the majority of courts have held that in the absence of special circumstances that are common to various types of cases, particularly disability of the plaintiff or fraudulent concealment by the defendant, the cause of action accrues and the statute commences to run at the time of the wrongful act. Among the common situations involving this issue are the foreign body cases, i. e., those where the gauze sponge or surgical instrument is left in a patient at the time of surgery. Most cases place the accrual of the cause of action at the closing of the incision, not at the discovery of the fact some time afterward. The statute usually is held to run from the wrongful act, not the date the damage occurs. * * *' " (emphasis supplied) 146 S.E.2d at pp. 189–190.

The Court also held that the only basis on which the running of the statute could be tolled was fraud, and that even then actual (and not constructive) fraud was required. Measured by this standard the plaintiff's proof in *Hawks* failed to establish "such trick or artifice or purpose" (146 S.E.2d at p. 190) on the part

of the doctor sufficient to toll the running of limitations.

■■ While the Court, on the facts of the case, was rejecting only the discovery rule, the emphasized language indicates to us a rejection of any acceptance of any exception, other than legal disability of the plaintiff because of infancy or insanity or actual fraud on the part of a defendant in concealment of a cause of action, to the general tort rule of that state. Particularly is this so because the West Virginia *Morgan* case, which the Virginia case rejected, discussed, *inter alia*, the continuing treatment rule. We can only conclude that Virginia would not, in an appropriate case, embrace the continuing treatment rule. It follows that any acts of alleged malpractice occurring more than two years prior to March 12, 1965 are barred by limitations under Virginia law.

*Sufficiency of Evidence of Malpractice*

In dealing with the sufficiency of the evidence to show malpractice within the two years prior to March 12, 1965, we are met at the outset with inconsistencies in the plaintiff's proof. Her theory of recovery is that it was malpractice to discharge her from the hospital on June 16, 1963 in the belief that she would not need a colostomy and without any arrangement for any additional medical care from the defendants; that it was malpractice not to have advised her of the necessity of a colostomy and that it was malpractice not to have performed a colostomy on her.

■ Plaintiff's testimony, and that of her husband, was that she was told that she would *not* need a colostomy and that she was discharged from the hospital without any arrangement for further medical care, but the hospital records controvert this testimony both as to what was told her about the need for the operation and what was contemplated as to future medical care. In any event, even if we assume that she was told nothing about possible future need for the operation and that no arrangements were made for later medical care, we must decide if the evidence of her nausea, slight fever,

acute distress, buttressed by the fact that a colostomy was performed within twelve days after her release from the hospital was sufficient to warrant submission to a jury of the various charges of malpractice she makes. We think not.

Under Virginia law, the standard of care and skill to which a physician or surgeon is held is the standard of care and skill " 'such as is exercised generally by physicians of ordinary care and skill in similar communities.' " Fox v. Mason, 139 Va. 667, 124 S.E. 405, 406 (1924), overruled on other grounds, Madison v. Kroeger Grocery & Baking Co., 160 Va. 303, 168 S.E. 353 (1933). Succinctly stated, "Due care in a lumber camp might be gross negligence at Johns Hopkins." Id., 124 S.E. at p. 406. We had occasion to examine and apply the Virginia standard of care in Hicks v. United States, 368 F.2d 626 (4 Cir. 1966). Plaintiff's radiation treatments and three post-radiation hospitalizations occurred in Portsmouth, Virginia, which is in no sense a medical wilderness; but perhaps as an outgrowth of the rule that the standard of care is to be judged by the standards of the same or a similar community, the Virginia cases have all stressed the absolute necessity of expert medical testimony to establish the standard to be applied in any case from which the jury can determine if malpractice occurred. Reed v. Church, 175 Va. 284, 8 S.E.2d 285, 288 (1940); Alexander v. Hill, 174 Va. 248, 6 S.E.2d 661 (1940); Fox v. Mason, supra; Hunter v. Burroughs, 123 Va. 113, 96 S.E. 360 (1918); Dietz v. King, 184 F.Supp. 944 (E.D.Va. 1960). Indeed, Hicks v. United States, supra, was in large part a battle of experts.

Plaintiff's proof was lacking in any evidence of the standard by which it could be determined that Drs. Schlanger and Mayo failed to use due care in the matters complained of. While to a layman, plaintiff's description of her condition on discharge from the hospital would indicate the impropriety of her discharge, there is nothing in the record to show what a physician in Portsmouth, or a similar community, would think of it. Certainly, laymen, on this record, had no basis to decide if a colostomy should have been performed on plaintiff prior to June 16, 1963. The operation, performed twelve days later, was characterized by the operating surgeon as "not an emergency." If plaintiff's testimony that she was never told of the possible need for the operation is accepted, there is no proof of customary patient communication in Portsmouth, or a similar community, and in the absence of proof that the operation should have been performed sooner, there is no basis on which the jury could have determined plaintiff's damages from any failure to have told her what she might have had a right to know. We conclude that the district judge properly withdrew this portion of the plaintiff's case from the jury's determination.

Affirmed.