David L. CRADLE

v.

SUPERINTENDENT, CORRECTIONAL
FIELD UNIT # 7 (two cases).

Civ. A. Nos. 73-C-72-H, 73-C-73-H.

United States District Court,
W. D. Virginia,
Harrisonburg Division.

April 2, 1973.

William A. Carter, III, Asst. Atty. Gen., Richmond, Va., for respondent.

## OPINION and JUDGMENT

DALTON, District Judge.

David L. Cradle, a Virginia state prisoner, brings these two actions pursuant to the provisions of 42 U.S.C. § 1983, 28 U.S.C. § 1343. In Civil Action No. 73–C–72–H he seeks monetary damages, alleging that he was placed in isolation on November 9, 1973, while at Correctional Field Unit # 7, White Post, Virginia and unjustly held for over 48 hours in a cold cell, without writing materials. In Civil Action No. 73–C–73–H he repeats the above allegations, and contends that he lost one of his testicles and has suffered kidney trouble as a result of not receiving proper medical care during the period of his incarceration, for which he requests monetary damages and unspecified injunctive relief.

 Respondent R. L. Berry, who was Acting Superintendent at Unit # 7 during November of 1973, has submitted affidavits supporting his motion for summary judgment. He states that on November 7, 1973, petitioner was charged with two violations of institutional rules: refusing to obey a direct order (to report for a head count), and disruptive behavior (abusive language directed at guards). On November 8, 1973, he was charged with interferring with an employee in the performance of his duties. Adjustment Committee Action Reports were written up on each charge, and given to petitioner. On November 9, 1973, respondent referred petitioner to the Unit's Adjustment Committee. Cradle requested the right to employ an attorney, and was allowed to place telephone calls. Respondent says that he became concerned about Cradle's behavior and the disruptive influence it was having on other inmates, and deemed it advisable to place petitioner in detention on November 9, 1973, pending the hearing of the Adjustment Committee. While inmates charged with institutional violations should not routinely be placed in detention awaiting such hearings, it is entirely permissible to do so when the circumstances warrant. *See* the Division Guidelines For Corrections' Personnel at p. 7.[1] Since petitioner indicated that he wished to employ a private attorney to represent him at the hearing, petitioner's hearing was postponed for four days. The Division Guidelines (at p. 8) specifically state that once such a continuance has been allowed, the inmate may be kept in detention for the four day continuance period. Respondent has taken care to show that Cradle was kept in a detention status, in that he had all of his personal belongs and was fed three meals daily, and was not subjected to isolation status, as petitioner infers, even though petitioner was actually incarcerated in an isolation area cell. This was necessary, according to respondent, because Unit # 7 has only four separate cells in which inmates can be individually confined.

The court has examined the isolation area logs[2] of Unit # 7 for the dates of November 9–13, 1973, the period in which Cradle was in detention, and they reveal that his complaint about a cold cell is groundless. The temperature logged in the isolation area ranged from a low of 74° to a high of 85° during that period—with the temperature at 80° or above most of the time. Portable electric heaters and writing materials were available to Cradle upon request, according to respondent, but he did not request either.

Petitioner never had an Adjustment Committee hearing on any of the three

---

1. Submitted as Enclosure A of Respondent's Supplemental Exhibit I.

2. Submitted as Enclosure D to Respondent's Exhibit I.

charges that were placed against him, for on the morning of November 13, 1973, he was released from detention and sent to Richmond, where he was admitted to the Medical College of Virginia for surgery the next day. He remained there until November 27, 1973, when he was removed to the prison hospital as a result of his disruptive behavior.

Petitioner's final allegation is that he has lost one of his testicles and suffered kidney trouble because he did not receive timely medical treatment. He states that for four years he had tried to get a proper medical examination in order to determine what was wrong with his testicles, but was unable to do so until 1973.

Respondent has submitted the affidavits of three physicians who have treated Cradle and Cradle's prison medical records in support of his motion for summary judgment. Petitioner's medical problem is explained in the affidavit of Dr. M. J. Vernon Smith, a certified urologist, who first saw Cradle on August 28, 1973, when petitioner complained that his right testicle became painful when he did hard work. According to Dr. Smith, at that time, Cradle's left testicle appeared small and wasted, and was probably non-functional due to "torsion." He defined torsion as a congenital condition that is usually manifest at or just after puberty, but which can occur at any age, in which a testicle rotates on its suspending cord resulting in blockage of the blood supply and death of the testicle—usually within twelve hours. When Cradle was operated on at the Medical College of Virginia on November 16, 1973, the dead left testicle was removed and a left testicular prosthesis was placed, and the right testicle was fixed to prevent torsion from occurring.

Petitioner's medical records reveal that he had had problems with his left testicle swelling intermittently since he was thirteen years of age. The earliest record of this problem in his extensive prison medical records is a notation of September 27, 1963. There are other notations in July and August of 1968, when Cradle had testicular swelling and pain, for which he was treated with penicillin and given bed rest. Dr. Smith states that as torsion most commonly occurs in young men between the ages of twelve and sixteen, while Cradle was twenty-three in 1968, the treating physician treated the condition as an infection (epidedymitis), which also occasionally occurs. However, as Dr. Smith found during surgery, plaintiff lost his left testicle due to torsion, which Dr. Smith states probably occurred during this period in 1968.

 This court will not express an opinion as to the propriety of petitioner's treatment in 1968, as such matters as involve medical judgments are ordinarily not questions for judicial review.[3] Even if an institutional physician has been negligent or mistaken in his diagnosis, such an error would not raise a constitutional issue cognizable in a § 1983 action in the absence of some evidence of abuse, mistreatment or denial of essential medical attention. *See, e. g.,* Bishop v. Cox, 320 F.Supp. 1031 (W. D.Va.1970). Petitioner certainly has

---

3. In addition, under Virginia law the rule even in medical malpractice cases is that the right to bring an action for personal injury begins to run when the wrong is done and not when the plaintiff discovers that he has been damaged. Morgan v. Schlanger, 374 F. 2d 235, 239 (4th Cir. 1967); Hawks v. DeHart, 206 Va. 810, 146 S.E.2d 187, 189 (1966). Though respondent has not set up the statute of limitations as a defense to any of the allegations herein, the court would note that any claim that Cradle might make for personal injury as a result of the treatment he received in 1968 would be barred by either the two-year statute of limitations on "personal injury" actions under § 1983 established in Almond v. Kent, 459 F. 2d 200 (4th Cir. 1972), or the one-year statute of limitations made applicable to *all* § 1983 actions recently by the Virginia General Assembly, Code of Virginia § 8–24 (as amended in 1973).

not been denied medical care.[4] As to the alleged lack of success of that care, it does not constitute a constitutional deprivation over which this court has jurisdiction. *See, e. g.,* Wilson v. Slayton (Civil Action 511–72–R) (Mem.Dec.) (E.D.Va. November 13, 1972). According to Dr. Smith, once torsion occurs and a testicle dies, there is nothing that can be done save what was done in this case: surgery for cosmetic reasons, and fixation of the remaining testicle to prevent it from undergoing torsion. Dr. Smith recommended surgery for Cradle after his examination on August 28, 1973; at petitioner's request it was delayed, and was eventually performed on November 16, 1973. Petitioner can still function as any normal male, and is probably still fertile, according to Dr. Smith.

■ Petitioner relates no specifics regarding his "kidney problem." The affidavit of Dr. M. C. Richards, who saw Cradle on two occasions in regard to this complaint, has been submitted by respondent. Dr. Richards saw petitioner on February 22, 1972, when he complained of pain over his left kidney. A urinalysis revealed pus in Cradle's urine, for which an antibiotic was prescribed. Petitioner was seen again on March 3, 1972, but a urinalysis was negative and no further medication was ordered. Dr. Richards saw petitioner again on June 11, 1973, but no mention of the previous kidney problem was made by Cradle. Dr. Richards referred Cradle to Dr. Smith at that time in regard to his testicle problem, but Richards says that there was no relationship between his testicle and kidney problems.

■ Petitioner has not stated by any stretch of the imagination a claim for damages in this action against Supt. Berry, who was Acting Superintendent at Unit # 7 from November 1, 1973 until December 14, 1973, and no other party has been named as a respondent. The State of Virginia cannot be held lia-

ble for damages in such a case as this, as it is not a "person" within the meaning of § 1983. See, e. g., Frye v. Lukehard, 364 F.Supp. 1379 (W.D.Va.1973). There is no ground for awarding any injunctive relief.

Petitioner has stated no claim which rises to the level of a deprivation of constitutional magnitude. Accordingly, and for the above reasons, respondent's motion for summary judgment is hereby granted.

The clerk is directed to send certified copies of this opinion and judgment to petitioner and to counsel for respondent.

---

4. There are over 120 notations in Cradle's prison medical records since 1968 of in-stances where he has been seen by physicians for various maladies.