In the Matter of CHICAGO, ROCK IS-
LAND AND PACIFIC RAILROAD
COMPANY, Debtor–Appellee,

v.

RICHMOND, FREDERICKSBURG AND
POTOMAC RAILROAD COMPANY,
Petitioner–Appellant.

No. 86–1109.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1986.

Decided Dec. 2, 1987.

As Amended Feb. 22, 1988.

Ann E. Acker, Chapman & Cutler, Chica-
go, Ill., for debtor-appellee.

Barry Sullivan, Jenner & Block, Chicago,
Ill., for petitioner-appellant.

Before WOOD, COFFEY and
RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

This case arises from the bankruptcy of
the Chicago, Rock Island and Pacific Rail-
road Company ("Rock Island"). The dis-
pute concerns an interpretation of the rem-
edies section of the Equipment Sublease
Agreement ("the Sublease") between Rock
Island and the petitioner, the Richmond,
Fredericksburg and Potomac Railroad
Company ("RF & P"). RF & P and Rock
Island entered into the Sublease while
Rock Island was in bankruptcy. RF & P
seeks to enforce a liquidated damages pro-
vision contained in the Sublease. The dis-
trict judge, who has overseen the bankrupt-
cy of Rock Island since its filing in 1975,
refused to enforce the provision, finding
that his Early Termination Order had extin-
guished the Sublease before RF & P gained
a right to liquidated damages. RF & P
appeals the decision.

*FACTS*

On March 17, 1975, Rock Island filed a
petition for reorganization pursuant to sec-
tion 77 of the Bankruptcy Act, 11 U.S.C.
§§ 1161–74 (1982 & Supp.1986). The Unit-
ed States District Court for the Northern
District of Illinois ("the Reorganization
Court") determined that the Rock Island
line could be reorganized as a viable rail-
road and so ordered that the Trustee con-
tinue Rock Island's rail operations. Rock
Island was required to purchase new equip-
ment, including rolling stock, in order that
it might continue its rail operations. The
new equipment was purchased on credit.
Thus, financing the ongoing rail operations
gave rise to an inherent conflict between
the new investors, who wanted security for

their advances to Rock Island, and the stockholders and prior creditors, who wanted to guard their places in the queue for the assets of the bankrupt business. In fact, during the first year of Rock Island's bankruptcy, this court was called upon to adjudicate a dispute over Rock Island's long-term lease of fifty-six locomotives. *See In re Chicago, Rock Island & Pacific RR*, 545 F.2d 1087 (7th Cir.1976).

The Sublease at issue reflects the divergent interests of the stockholders and older creditors on the one hand, as contrasted with more recent creditors on the other. RF & P, as owner-lessor, provided twenty-five percent of the financing for the purchase of four hundred piggyback trailers ("the Equipment") and remained liable for the balance. The Equipment was then leased to Intermodal Services, Inc. ("Intermodal"), and in turn was subleased to Rock Island. (Tax considerations governed much of the transaction's structure.)[1] To protect its investment, RF & P sought the highest possible lien priority for the liabilities of the Rock Island under the Sublease. The Reorganization Court agreed that those liabilities would be deemed administrative expenses, senior to the interests of Rock Island's stockholders and pre-bankruptcy creditors. In addition, the parties agreed to the liquidated damages clause now at issue. The liquidated damages clause provides that, in the event of a default during the life of the Sublease, RF & P, upon notifying Rock Island of the default and terminating the Sublease, could recover not only rentals already accrued, but also compensation for its loss of future earnings under the Sublease.

Rock Island stockholders and prior creditors were concerned with the railroad's potentially large liabilities under long-term equipment leases should Rock Island decide to end its rail operations. In order to protect its investment, it was agreed by the parties that the term of the Sublease be limited by an "Early Termination" clause. In that clause, the parties also agreed that if the Reorganization Court ordered Rock Island to discontinue rail service, the Sublease would be terminated and Rock Island's liability under the Sublease would be limited to obligations previously accrued, in addition to the various costs associated with redelivering the Equipment to RF & P.[2]

1. Both parties have noted that leveraged leasing, the type of financing employed in the instant transaction, is a tax-oriented method of financing.

2. Section 3 defines the term of the Sublease. It provides:

> Section 3. *Term of the Lease.*
> The term of this Lease as to each Item of Equipment shall begin on the date of the delivery to and acceptance by the Lessee of such Item of Equipment and, subject to the provisions of Sections 11, 14 and 18 hereof, shall terminate upon the earlier of (a) the date occurring nine years following the Term Lease Commencement Date provided for in Section 2.1(a) hereof, or (b) in the event the Court orders the termination of this lease as to all Items of Equipment then leased hereunder in connection with the discontinuance of substantially all service and/or the liquidation of the assets of the Rock Island Railroad (the "Early Termination Order"), the date of return (the "Early Termination Date") of such Item of Equipment by the Lessee in the manner contemplated by Section 13.2 hereof. Upon the return of an Item of Equipment to the Lessor pursuant to Section 13.2, the obligation of the Lessee to pay rentals in respect of such Item accruing subsequent to the Early Termination Date shall terminate and the Lessor shall have no claim against the Lessee or the estate of the Rock Island Railroad for such unaccrued rental; provided that the Lessee shall thereafter continue to be liable in respect of any obligation which accrues hereunder *prior to such termination* until payment or performance of such obligation in full and the Lessee shall in any event remain liable for each of its obligations under Section 13.2 hereof for the period provided therein; and provided, further, that no Reorganized Company (as defined in Section 14.1 hereof) which at any time may become the successor lessee hereunder may exercise any right to terminate this Lease pursuant to clause (b) above.

Chicago Pacific Corporation, Appendix to "Memorandum in Support of Motion for Summary Judgment," ("CPC Appendix"), Exh. F 6.

Section 13.2 of the Sublease provides for the return of the Equipment in the event of an Early Termination Order. Section 13.2 provides, in relevant part:

> 13.2 *Return in Connection With Early Termination.*
> In the event the Court shall enter an Early Termination Order, the Lessee will, at its own cost and expense, deliver possession of each Item of Equipment to the Lessor at such loca-

The Sublease was executed on October 1, 1978 and was approved by the Reorganization Court on November 9, 1978. In less than a year, Rock Island's financial position became more precarious. On September 26, 1979, the Interstate Commerce Commission ("the ICC") determined that Rock Island's cash position made its continuing operation impossible and ordered the Kansas City Terminal Railway Company ("KCT") to operate the Rock Island system, pursuant to 49 U.S.C. § 11125 (1982 & Supp.1986). Under the ICC order, KCT was required to make rental payments due under the Sublease on behalf of Rock Island. On January 25, 1980, the Reorganization Court ordered the Trustee to prepare a plan for the liquidation of Rock Island's estate.

KCT made the payments due on the Sublease from October 1979 through March 1980. On March 31, 1980, the ICC order expired. Although the Trustee believed that KCT would also make the payment due on April 1, 1980, KCT failed to do so. Failure to make that payment constituted an event of default under the Sublease and entitled RF & P to pursue the remedies available under section 14.2 of the Sublease, including liquidated damages under section 14.2(b). However, neither RF & P nor Intermodal (*see supra* at 683) immediately notified Rock Island that it was in default.

On May 5, 1980, the Trustee appeared before the Reorganization Court and requested an Early Termination Order. The court declined to issue the order on May 5 because not all interested parties were prepared to respond to the Trustee's request. However, the court stated that the *status quo* would be preserved until May 9, when the issue would be finally resolved. On May 9, 1980, before the hearing scheduled for discussion of the Early Termination Order, counsel for Intermodal served the Trustee with written notice of default. The notice of default purported to preserve all of Intermodal's rights under section 14.2 of the Sublease, but did not explicitly terminate the Sublease. RF & P did not appear at the May 9 hearing. Following the hearing, the court entered its Early Termination Order and stated that the order terminated the lease effective May 5, 1980. Months later, on August 25, 1980, RF & P sent Rock Island notice of termination of the Sublease.

After entry of the Early Termination Order, Rock Island returned the Equipment to RF & P, pursuant to section 13.2 of the Sublease. On appeal, we are asked to determine the applicability of the liquidated damages provision of section 14.2(b) of the Sublease. Since entry of the Early Termination Order, RF & P has acquired all rights under the Sublease, including those of Intermodal. In addition, the Chicago Pacific Corporation ("CPC"), the reorganized version of Rock Island, has replaced the Trustee as the representative of the interests of Rock Island. Thus, only RF & P and CPC are parties to this dispute.

## THE TRIAL—REORGANIZATION COURT'S DECISION

The Reorganization Court rejected RF & P's bid to collect liquidated damages under section 14.2(b) of the Sublease. In the Reorganization Court's view, the Sublease provided two options to the lessor if the lessee defaulted. First, the lessor could pursue its ordinary legal and equitable remedies, pursuant to section 14.2(a) of the Sublease. Second, the lessor, upon written notice to the lessee, could demand liquidated damages under section 14.2(b) of the Sublease. The Trustee's failure to make the April 1, 1980 rental payment was an event of default, entitling RF & P to pursue its remedies under section 14.2. However, the court held that the express lan-

---

tion on property owned or leased by the Lessee or any company affiliated therewith as the Lessor may designate, or in the absence of such designation, as the Lessee may select, and permit the Lessor to store such Item of Equipment on such tracks for a period not exceeding 90 days and transport the same at any time within such 90-day period to any reasonable place on any railroad lines operated by the Lessee or to any connecting carrier for shipment, all as directed by the Lessor upon not less than 30 days' written notice to the Lessee. All movement and storage of such Item is to be at the risk and expense of the Lessee.

CPC Appendix, Exh. F 17–18.

guage of section 14.2(b) created a right to liquidated damages premised upon written notice of termination of the Sublease by the lessor. Because neither RF & P nor Intermodal gave Rock Island the appropriate notice before the Reorganization Court's Early Termination Order became effective on May 5, 1980, the Sublease could not have been terminated subsequently by RF & P, pursuant to section 14.2(b). Therefore, no right to liquidated damages arose. Thus, the court held that RF & P was limited to the remedies set forth in section 13.2 of the Sublease, the remedies available following court-ordered Early Termination. *In re Chicago, Rock Island & Pacific RR*, No. 75 B 2697, slip op., 8–10 (N.D.Ill. Dec. 3, 1984).

*DISCUSSION*

Because we agree with the Reorganization Court's interpretation of the Sublease, we affirm the district court's decision granting summary judgment in favor of CPC. We address RF & P's arguments raised on appeal.

██ Initially, RF & P argues that its right to liquidated damages "accrued" at the time of the default; thus, Rock Island was obligated to pay the liquidated damages when the Reorganization Court ordered Early Termination, so the Early Termination Order could not eliminate those rights. RF & P supports its argument with case citations holding that a cause of action accrues when a litigant is entitled to sue another. *See Farish v. Courion Industries, Inc.*, 754 F.2d 1111, 1113 (4th Cir.1985); *Morgan v. Schlanger*, 374 F.2d 235 (4th Cir.1967); *Owens v. Combustion Engineering, Inc.*, 279 F.Supp. 257, 259 (E.D.Va.1967). The availability of liquidated damages is governed under the contract entered into between the parties. Section 14.2 of the Sublease provides in relevant part:

14.2 *Remedies.* If any Event of Default has occurred and is continuing, ... the Assignee, at its option, may:

.    .    .    .    .

(b) *By notice in writing to the Lessee, terminate this Lease,* whereupon all right of the Lessee to the use of the Equipment shall absolutely cease and terminate as though this Lease had never been made, but the Lessee shall remain liable as hereinafter provided; and thereupon, the Lessor or such assignee or the Assignee, as the case may be, may by its agents enter upon the premises of the Lessee or other premises where any of the Equipment may be located and take possession of all or any of the Items of Equipment and thenceforth hold, possess and enjoy the same free from any right of the Lessee, or its successors or assigns, to use such Items for any purpose whatever, but *the Lessor, such assignee or the Assignee,* as the case may be, *shall nevertheless have a right to recover from the Lessee any and all amounts which may have accrued to the date of such termination* (computing the rental for any number of days less than a full rental period by multiplying the rental for such full rental period by a fraction of which the numerator is such number of days and the denominator is the total number of days in such full rental period) and also to recover forthwith from the Lessee (i) *as damages for loss of the bargain* and not as a penalty, whichever of the following amounts the Lessor, such assignee or the Assignee, as the case may be, in its sole discretion, shall specify: [formulas for computing liquidated damages then are provided].

CPC Appendix, Exh. F 21–22 (emphasis added). We agree with the Reorganization Court that this section of the Sublease expressly conditioned recovery of liquidated damages on written notice of termination to the lessee. Because notice was not given until *after* the Early Termination Order had extinguished the Sublease, the Reorganization Court properly concluded that RF & P's right to liquidated damages never accrued.

Where a party to a contract expressly provides for the termination of the contract by written notice, failure to provide that notice results in failure to terminate the contract. 6 *Corbin on Contracts,* § 1266,

at 56, 64 (1962 & Supp.1984); *Baker v. Missouri National Life Ins. Co.*, 372 S.W. 2d 147, 152 (Mo.1963). When, in August 1980, RF & P eventually sent Rock Island notice of termination, the Sublease had been previously nullified with the Early Termination Order. Any subsequent notice of termination by RF & P was ineffective "for the obvious reason that a contract already lawfully terminated cannot be terminated again." *Baker*, 372 S.W.2d at 153.

RF & P argues that this interpretation of the Sublease destroys its protection under section 14.2 by allowing the Reorganization Court to preclude the remedies provided in the Sublease at any time by issuing an Early Termination Order. It does not. The Reorganization Court's—and this court's—interpretation of the Sublease simply requires RF & P to exercise its rights under section 14.2(b) by giving notice of termination before the lease is otherwise terminated. Because the Sublease provided a five-day grace period for rental payments, the Trustee's failure to make the April 1, 1980 rental payment resulted in an event of default on April 6, 1980. When the default occurred, Rock Island had been without sufficient cash flow to finance continuing operations since the previous September and had been preparing for liquidation since the previous January. A month after the default, the Reorganization Court terminated the Sublease. RF & P could have ensured its right to liquidated damages with the delivery of a written notice of termination at any time between the April 6 default and the May 5 Early Termination Order. We refuse to redraft the Sublease to permit RF & P to rectify its failure to act in a timely fashion pursuant to the terms of the contract.

RF & P also argues that Intermodal's May 9, 1980 notice of default provided Rock Island with proper notice under section 14.2(b). This argument fails. As the Reorganization Court pointed out, the rights of all parties were frozen on May 5, 1980. Issuing of the Early Termination Order was delayed until May 9 only to provide the parties the opportunity to consider the matter. Moreover, the order was effective as of May 5, not May 9. Thus, Intermodal's notice of default came too late to invoke section 14.2(b)'s damage provision. *In re Chicago, Rock Island & Pacific RR*, slip op. at 10. Furthermore, even assuming that Intermodal's notice had preceded the Early Termination Order, that notice did not purport to terminate the lease and invoke the liquidated damages provision of section 14.2(b), but instead purported only to reserve "all ... rights and remedies pursuant to Section 14.2," including the right to sue for continued performance under section 14.2(a). *See* CPC Appendix, Exh. J. We fail to understand how a letter reserving the right to insist upon continued performance can be construed as notice of termination.

As RF & P points out, a contract should be construed as a whole, so that various provisions of the contract are harmonized and none are rendered meaningless. *See Brand Distributors, Inc. v. Insurance Company of North America*, 532 F.2d 352 (4th Cir.1976). We believe that the Reorganization Court's construction of the Sublease accomplishes that goal when it fulfills the intent of the parties, as expressed in the contract. Section 14.2(b) protected RF & P by giving it the power to terminate the lease and gain the benefit of its bargain if Rock Island defaulted during the life of the Sublease. Sections 3 and 13.2 protected the stockholders and prior creditors of Rock Island by allowing them to terminate the Sublease and limit Rock Island's liabilities to those expressed in section 13.2 if continued rail operations became impossible. Both contingencies came to pass; Rock Island defaulted and the Reorganization Court ordered rail service discontinued. A *fortiori*, only one party could take advantage of the complimentary protections of the Sublease. Rock Island succeeded and RF & P failed.

RF & P argues that "[i]t is ludicrous to assume RF & P would have agreed to language whereby a defaulting Rock Island, by racing to the post office and the courthouse and obtaining an early termination order, could deprive RF & P of [liquidated] damages to compensate it for the terminated lease." Petitioner's Brief

29. This argument is not wholly without merit. Perhaps none of the parties to the Sublease contemplated the possibility of both a default and an early termination. When a court is called upon to interpret a written contract, it must strive to enforce the parties' intent, as set forth in the language of the instrument. As written, the Sublease allows an Early Termination Order to nullify section 14.2(b)'s liquidated damages provision even if a default has occurred. To preserve its right to liquidated damages, the lessor must timely serve written notice of termination, in this instance, before the issuance of the Early Termination Order. We refuse to redraft the Sublease to compensate the loser of the race.[3]

In summary, RF & P has failed to convince us that the Reorganization Court's reading of the Sublease was erroneous. The language of the Sublease conditions the right to liquidated damages on the lessor's written notice of termination to the lessee. Notice herein was not given until after the Reorganization Court's Early Termination Order had extinguished the right of the lessor to pursue liquidated damages under the Sublease. We affirm the Reorganization Court's decision granting summary judgment in favor of CPC.[4]

---

**3.** We note that at least one of Rock Island's equipment leases explicitly provided for the possibility of an ongoing default at the time an Early Termination Order is issued. In a lease of three hundred open-top hopper cars from the U.S. Steel Credit Corporation, the parties provided that an Early Termination Order would nullify that lease's liquidated damages clause only if Rock Island were not then in default under the lease. The lease states that, in the event of a default by the lessee, the lessor may pursue liquidated damages, labeled "the Stipulated Loss Value,"

> provided, however, that in the event the United States Federal District Court for the Northern District of Illinois finds that Lessee is unable to transport the traffic offered it because its cash position makes the continuing

operation of the debtor impossible or finds any other facts which result in an order that the Lessee discontinue service and/or liquidates the assets of the Lessee, *and further provided* that the Cars are returned to Lessor and *that Lessee is not in default of any provision of this Agreement,* Lessor agrees to waive its rights to the Stipulated Loss Value.

Rec., Vol. II, Doc. 4, "Lease Between U.S. Steel Credit Corp. and William Gibbons," 18 (emphasis added). The clarity of that provision stands in stark contrast to the strained reading of the Sublease that RF & P would have us undertake here.

**4.** RF & P also raises issues of improper notice and estoppel. We find these arguments meritless.